[No. 15117.  Department One.  April 2, 1919.]

F. J. MOUSO, *Respondent*, v. BELLINGHAM & NORTHERN
RAILWAY COMPANY, *Appellant*.[1]

RAILROADS (66)—CROSSING ACCIDENT—CONTRIBUTORY NEGLIGENCE—
DUTY TO STOP, LOOK AND LISTEN.  Where the physical facts show
that the driver of a motor truck turning around near a railroad
crossing, could, if he had looked, have seen a switching train
seventy-five feet away in time to have applied the brakes and stopped,
he is guilty of contributory negligence as a matter of law, although
he testified that he looked constantly and applied the brakes imme-
diately, making every effort to stop, but skidded owing to the slip-
pery condition of the ground when he applied the brakes.

SAME (62, 63) — CROSSINGS — PROXIMATE CAUSE — LAST CLEAR
CHANCE.  The doctrine of last clear chance to avoid a crossing acci-
dent, when a switching train struck an auto truck, does not apply
where there was no evidence that the train was not brought to a
stop as quickly as conditions permitted after discovery of the truck.

Appeal from a judgment of the superior court for
Whatcom county, Pemberton, J., entered June 13,
1918, upon the verdict of a jury rendered in favor of
the plaintiff, in an action in tort, after a trial on the
merits.  Reversed.

*Geo. W. Korte* and *Curtis E. Abrams,* for appellant.
*Sather & Livesey,* for respondent.

TOLMAN, J.—This action was brought to recover for
damages to an automobile truck, occasioned by a col-
lision between the truck and a switch train then being
operated by appellant.  The facts, as shown at the
trial below, are substantially as follows:

The collision occurred at about 2:30 p. m. on De-
cember 18, 1917, at the intersection of Chestnut street
with appellant's main line spur track, in the city of
Bellingham.  The truck was being operated by an

[1]Reported in 179 Pac. 848.

experienced truck driver, fully familiar with all of the surrounding conditions, who had driven a truck across this particular track ten or a dozen times a day for some time previous to the accident. At the time in question, the driver had driven along "C" street to its intersection with Chestnut street, and then, because the planking on Chestnut street was but sixteen feet wide and turning the truck thereon was difficult, he proceeded to back the truck down Chestnut street toward his loading point, which was some one hundred and thirty-five feet beyond the railroad crossing.

The driver testified that he was thus moving at a speed of about three to three and a half miles per hour; that he constantly looked in the direction from whence the train came, but saw and heard nothing of it; that, because of a building which obstructed his view, he could see only a distance which he estimated at twenty-five to thirty feet down the track in the direction from which the train came; that, as he approached the track upon which the train was operating, he saw a box car shoot out from the curve; that he immediately applied the brakes and could have stopped the truck instantly, but that it was raining and the ground was wet and slippery; that the truck skidded onto the track, and before he could reverse his engine, the car struck the truck, pushing it a distance of some twenty-five feet against a pile of timbers and there crushing it.

The truck projected to the rear of the driver's seat a distance of fourteen feet, and the undisputed evidence of a civil engineer, who made actual measurements, is to the effect that the driver, at a distance of twenty-five feet from the first rail of the track upon which the train was moving, could see past the ob-

structing building and along the track for a distance
of 77.9 feet; at twenty feet he had an unobstructed
view for a distance of 99 feet; and at fifteen feet, the
view was clear for a distance of 161.7 feet. The train
was made up of an empty box car, forty feet in length,
ahead of the engine as it approached the crossing, the
engine, tender, and three loaded oil tank cars, in the
order named, and was moving without working steam,
at a speed of four or five miles an hour. The engineer
from his side of the cab could not see the approaching
truck because of the box car ahead, on top of which a
brakeman was stationed.

When the front end of the box car was from sixty
to eighty feet from the crossing, the approaching
truck was seen by the brakeman and the fireman, both
of whom gave the engineer a signal to stop; and the
brakeman also shouted to attract the attention of the
truck driver, and continued to signal and shout until
the collision occurred. The engineer, immediately on
receipt of the signal, turned on the sand and the emer-
gency brakes, but because of the slippery condition
of the rails and the surge forward of the 240,000
pounds of oil in the tank cars, the wheels on the engine
and tender slipped or slid, the sand did not take ef-
fect, and the train could not be brought to a stop
until the truck was crushed against the timber pile
as before stated.

It is admitted that the air was not coupled up on
the train, and the evidence is undisputed that in
switching operations that is impracticable and is
never done. It also appears that the spur track on
which the accident happened was not in constant use,
though it was usual for the switching crew to go in
there every day about five o'clock p. m., and more or
less frequently at other hours. There is also testi-

mony that the train should and might have been stopped within twenty feet, but no attempt is made to deny the testimony of the engineer to the effect that he did everything which could be done as soon as he received the signal, and that the failure to stop sooner was due to the wet and slippery condition of the track, the sliding of the wheels, and the liquid load behind the engine, which impelled the train forward, overcoming, to some extent, the action of the brakes.

The negligence charged in the complaint is that appellant failed to keep a watchman at the crossing to give the public warning, and that the train was moving at an excessive rate of speed. The answer raises the issue of contributory negligence on the part of the truck driver. Appellant moved for a nonsuit at the close of respondent's case in chief, entered a motion for a directed verdict at the close of all of the testimony, and after the rendition of the verdict moved for judgment *non obstante veredicto*.

The trial court properly instructed the jury that the law did not require appellant to employ a switchman at the crossing in question, and we fail to find any evidence of excessive speed. But as appellant did not stand upon its motion for a nonsuit at the close of respondent's case, we will not discuss these questions.

One who approaches a railway crossing on a public highway is as much under the duty of keeping a lookout as is the railway company; and with knowledge that the railway company has the right of way and cannot instantly stop its trains to avoid accidents, it becomes his duty to use every means which a reasonably prudent person would use under the existing circumstances to avoid a collision. Did the driver of the truck perform this duty? He says he did. But

his testimony in this respect is denied and overcome by the physical facts. The uncontradicted testimony of the civil engineer, and the map which he prepared, show beyond cavil that, had the driver looked when he was a distance of twenty-five feet from the track, he could have seen the approaching train, which must have then been within the seventy-seven feet of clear view, and would then have had ample space within which to make the stop, which actually required six or eight feet. The physical facts show that the driver could not have looked until he was approximately fifteen feet from the track and the rear of his truck within a foot or two of the first rail; as, with the skidding, the truck moved six or eight feet after the brakes were applied, and was struck midway between the driver's seat and the rear end. While this court has often held that the question of contributory negligence would not be taken from the jury and decided as a matter of law unless the commission or omission of the acts as shown were so palpably negligent as to preclude the possibility that reasonable men might differ concerning them, yet, in a case like this, where the physical facts are uncontroverted and speak with a force that overcomes all testimony to the contrary, reasonable minds must follow the physical facts, and therefore cannot differ. *Helliesen v. Seattle Elec. Co.*, 56 Wash. 278, 105 Pac. 458; *Fluhart v. Seattle Elec. Co.*, 65 Wash. 291, 118 Pac. 51; *Allison v. Chicago, Milwaukee & St. Paul R. Co.*, 83 Wash. 591, 145 Pac. 608; *McEvilla v. Puget Sound Traction, Light & Power Co.*, 95 Wash. 657, 164 Pac. 193; *Herrett v. Puget Sound Traction, Light & Power Co.*, 103 Wash. 101, 173 Pac. 1024.

The force of this conclusion was sought to be avoided in the trial court by invoking the last clear

chance rule. But we see no reason for the application of that rule here. There is no evidence to indicate that the train was not brought to a stop as quickly as conditions would permit after the discovery of the approaching truck. And even had there been such evidence, there was no such lapse of time as, under the law laid down in *Hartley v. Lasater,* 96 Wash. 407, 165 Pac. 106, would make it applicable. And still further, had the trainmen been able to see the approaching truck a sufficient time before the accident to make the rule applicable, they would have had the right to assume that the driver was using his senses, and would stop the truck before it entered the danger zone. *Miller v. Northern Pac. R. Co.,* 105 Wash. 645, 178 Pac. 808.

The trial court should have granted appellant's motion for a directed verdict.

The judgment is reversed, with directions to dismiss the action.

CHADWICK, C. J., MAIN, MACKINTOSH, and MITCHELL, JJ., concur.