Frances L. POWER, individually, and as administratrix of the Estate of Marilyn K. Power, Plaintiff-Appellee,

v.

UNION PACIFIC RAILROAD CO.,
Defendant-Appellant.

No. 79–4260.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 4, 1981.

Decided Sept. 17, 1981.

Robert R. Davis, Jr., Lane, Powell, Moss & Miller, Seattle, Wash., for defendant-appellant.

Richard T. Vlosich, Tacoma, Wash., (argued), for railroad-appellee; Frederick B. Hayes, P.C., Tacoma, Wash., on brief.

Before BROWNING and TANG, Circuit Judges and HEMPHILL *, District Judge.

TANG, Circuit Judge.

Frances Power, individually and as administratrix, brought this wrongful death

---

* Honorable Robert W. Hemphill, Senior United States District Judge for the District of South Carolina, sitting by designation.

action against Union Pacific, alleging that her daughter Marilyn's death resulted from the negligent operation of a Union Pacific train. Union Pacific invoked diversity jurisdiction and removed the action to federal court. After a trial without jury, the district court found Union Pacific twenty-five percent negligent, and awarded Power $183,760.00. Union Pacific appeals on the ground that (1) several district court findings and conclusions on the question of negligence were clearly erroneous; (2) the Washington Recreational Use Statute bars recovery; and (3) the damage award was excessive. Because we agree that several of the district court's key findings and conclusions were based on erroneous law, we reverse and remand.

## I

### FACTS

On the last day of school, June 6, 1975, decedent Marilyn Power (Marilyn), a 16 year old high school student, walked with some friends along the railroad tracks from "Sunset Beach", a cluster of homes located on the westside (waterside) of the tracks, to an undeveloped beach some half of a mile south. The group intended to attend a party at the beach, but began to walk back about 9:00 p. m. when the party did not materialize.

On the way back to Sunset Beach, Marilyn and her friends "met some other young people walking along the tracks who were also looking for the party. The two groups stopped and talked up to the time when the accident occurred, which was approximately 9:45 p. m.". The railroad bed contained two sets of tracks, and the group stood on or near the west set, which was nearest the water. Marilyn had been drinking gin and cola and, by this time, had had "[t]hree, maybe three [drinks] at most".

It was dusk. Several members of the group testified that they observed a train some two or three miles south; it had a headlight and was moving north along the coast toward them. The train disappeared from sight as it curved along the coast, but they "knew it was coming".

The group again saw the train as it came around the bend. The engineer and brakeman, both looking to the front of the train, also saw the group at a distance of some 1,200 feet as they came around the bend. The engineer and brakeman testified that they sounded the bell and whistle, although some of the group testified that they did not hear them.

"Shortly after the group of young people were seen by the engineer . . . and brakeman . . ., [Marilyn] walked from the west track to a point between the rails of the east track". The train, then about 250 feet from her, was moving at 60 miles per hour. Members of the group yelled to Marilyn or warned her that the train was coming and she should get off the east tracks. "[S]he waved to the train with both hands, one hand at a time, and stood on one leg". Jokingly she said, "this is it, I'm going to kill myself". "As the train approached [the engineer] observed the expression on [Marilyn's] face which initially was one of apparent happiness or 'light heartedness' and which turned to a fearful expression..." as the train got closer. When the engineer realized that Marilyn was not moving across the track he "dynamited" the brakes in an emergency stop. Within seconds, Marilyn attempted to jump clear of the train but was struck by the left front portion of the locomotive and killed.

## II

### Standard of Review

■ In reviewing a diversity case, we do "not overrule a district judge on the question of state law unless the judge's findings are 'clearly wrong'." *Gee v. Tenneco, Inc.*, 615 F.2d 857, 861 (9th Cir. 1980). "While this circuit does not regard the district judge's presumed expertise in the law of his or her own state to be infallible," we nonetheless regard "the standard of review on this issue as one which does restrict . . . scrutiny of the district judge's determination." *Id.*

■ We may regard a finding of fact as clearly erroneous not only if it is without

adequate evidentiary support, but also if it was induced by an erroneous view of the law." *Ritter v. Morton*, 513 F.2d 942, 949 (9th Cir.), *cert. denied*, 423 U.S. 947, 96 S.Ct. 362, 46 L.Ed.2d 281 (1975); *see also Travelers Indemnity Co. v. United States*, 543 F.2d 71, 73 (9th Cir. 1976). And if the district court's findings were induced by an erroneous view of the law, we independently consider the facts. *See United States v. Singer Manufacturing Co.*, 374 U.S. 174, 194 n.9, 83 S.Ct. 1773, 1784 n.9, 10 L.Ed.2d 823 (1963); *Rowe v. General Motors Corp.*, 457 F.2d 348, 356 n.15 (5th Cir. 1972) (cited by *Ritter v. Morton*, 513 F.2d 942, 949 (9th Cir.)). The question here, then, is whether the district court's findings and conclusions are based on a proper view of Washington state law and are adequately supported by the record.

### III

*Common Law Negligence*

1. *Marilyn's status—trespasser or licensee*

■ The district court found, without explanation, that Marilyn "was not a trespasser on the right-of-way or the tracks at the time of the accident." Union Pacific contends that this conclusion is clearly wrong under Washington law. We agree that the Washington Supreme Court probably would characterize Marilyn a trespasser, but conclude that whether trespasser or licensee, the same standard of care applies.

In *Winter v. Mackner*, 68 Wash.2d 943, 416 P.2d 453 (1966), the injured plaintiff contended that defendant's admitted knowledge of, and failure to object to, plaintiff's prior visits to defendant's construction site constituted an implied invitation to enter the premises. The court disagreed, holding that plaintiff was a trespasser within the following definition:

A trespasser is one who enters the premises of another without invitation or permission, express or implied, but goes, rather, for his own purposes or convenience, and not in the performance of a

duty to the owner or one in possession of the premises.

416 P.2d at 454.

Here, the district court apparently concluded that because Union Pacific had knowledge that people roamed in the area, it impliedly consented to Marilyn's presence. The record, however, fails to support such a conclusion. Although the brakeman had seen people near Sunset Beach (one quarter mile north of the accident) using footpaths above the tracks, and one witness testified that he had waved to trains from time to time, railroad personnel and police repeatedly tried to exclude people from the area and a "private property" sign had been posted at Sunset Beach. In contrast, in the *Winter* case defendant personally had seen the plaintiff on prior occasions and yet had taken no action to exclude him; the court held mere tolerance insufficient to create implied consent.

The *Winter* holding comports with the Restatement (Second) of Torts (1965), a treatise expressly followed by the Washington courts.[1] Section 330 of the Restatement (Second) defines a "licensee" as a "person who is privileged to enter or remain on land only by virtue of the possessor's consent." The comments explain the term "consent":

[T]he fact that the possessor knows of the intention to enter and does not prevent it is not necessarily a manifestation of consent, and therefore is not necessarily permission. A failure to take burdensome and expensive precautions against intrusion manifests only an unwillingness to go to the trouble and expense of preventing others from trespassing on the land, and indicates only toleration of the practically unavailable, rather than consent to the entry as licensee. Even a failure to post a notice warning the public not to trespass cannot reasonably be construed as an expression of consent to the intrusion of persons who habitually and notoriously disregard such notices.

---

1. *See, e. g., Memel v. Reimer*, 85 Wash.2d 685, 538 P.2d 517, 520 (1975) (en banc) (adopting Restatement (Second) of Torts § 342 as the standard of care owed licensees); *accord*

*Egede-Nissen v. Crystal Mountain, Inc.*, 93 Wash.2d 127, 606 P.2d 1214, 1218 n.4 (1980) (en banc).

On this record, then, Marilyn and her friends should be considered trespassers upon land the railroad patrolled and perhaps posted, but did not otherwise secure; the district court clearly erred in applying Washington law.

### 2. Standard of Care

Union Pacific argues that if Marilyn is considered a trespasser, it owed her only the duty to refrain from wilful and wanton conduct. Washington courts, however, have abandoned this standard. In *Potts v. Amis*, 62 Wash.2d 777, 384 P.2d 825, 830 (1963) (en banc), the Washington Supreme Court considered the proper standard of care owed a guest (licensee) who may be injured by a landowner's activity, as opposed to a passive condition of the land. As applied to licensees on a landowner's property with permission, the court replaced the old "wilful and wanton inflicting of harm" standard with a "rule of reasonable conduct under the circumstances." *See also Memel v. Reimer*, 85 Wash.2d 685, 538 P.2d 517, 519–520 (1975) (en banc) (citing *Potts* with approval).

Although we have found no recent Washington appellate cases applying this standard to trespassers, there is little doubt that the court would extend the *Potts* reasoning to provide that a landowner owes a duty to conduct his activities with reasonable care for the trespasser's safety. The Restatement (Second) (1965) again provides guidance. Section 336 states the following rule regarding activities dangerous to known trespassers:

A possessor of land who knows or has reason to know of the presence of another who is trespassing on the land is subject to liability for physical harm thereafter caused to the trespasser by the possessor's failure to carry on his activities upon the land with reasonable care for the trespasser's safety.

Thus, once the train engineer actually saw Marilyn and her friends on railroad property his duty of reasonable care began. The issue then becomes the scope of that duty under the circumstances of this case.

Union Pacific argues that the district court erred in holding that its engineer had breached his duty to apply the train's brakes as soon as he saw the group of young people near the tracks. We agree that in so concluding the court again misapplied Washington law.

In a long line of cases involving collisions between locomotives and automobiles attempting to cross railroad tracks, the Washington courts consistently have refused to impose a duty to brake when an engineer merely observes an automobile approaching the tracks. The Washington Supreme Court, for example, has stated:

"[O]ne operating a locomotive and train has a right to assume, until the contrary becomes evident, that one approaching the track in an automobile will give the train the right of way, and is not required to attempt to bring his train to a standstill because the automobile may be seen to be approaching the track, but has a right to assume, until the contrary appears, that the occupants of such automobile will use reasonable care for their protection, and will give the train the right of way to which it is entitled under the law."

*Klouse v. Northern Pacific Railway Co.*, 50 Wash.2d 432, 312 P.2d 647, 651 (1957), *quoting Hopp v. Northern Pacific Railway Co.*, 20 Wash.2d 439, 147 P.2d 950, 951 (1944); *accord Sadler v. Northern Pacific Railway Co.*, 118 Wash. 121, 203 P. 10, 12–13 (1921); *Mouso v. Bellingham & Northern Railway Co.*, 106 Wash. 299, 179 P. 848, 850 (1919). Although these cases were decided under the old contributory negligence and last clear chance doctrines, the same duty should apply under the new comparative negligence scheme. Likewise, the same reasoning should apply to pedestrians standing near the tracks. *Cf., e. g., Deere v. Southern Pacific Co.*, 123 F.2d 438, 443 (9th Cir. 1941), *cert. denied*, 315 U.S. 819, 62 S.Ct. 916, 86 L.Ed. 1217 (1942) (applying Oregon law, we stated: "If 'trainmen see a person on or near the track and there is nothing to indicate that he is unconscious of danger from the train, no duty devolves upon them to stop'.")

The extension of the Washington holding to pedestrians also gains support from the Restatement (Second) section 336. Comment d, subsection 1 states:

> The possessor of land is entitled to expect that a trespasser who is warned or otherwise has reason to believe that the possessor intends to do an act which involves danger to the trespasser will yield precedence to him and knowing of the danger, will avoid it. Therefore, the possessor may, if he gives reasonable warning, continue his activities in such a way as he pleases unless the situation is such that he should realize that a warning will not be effective to enable the trespasser to avoid harm. Such a situation may arise where the danger is so imminent that careful action on the possessor's part is the only means of preventing the harm, or where the trespasser is obviously incapable of appreciating the warning, or where after the warning has been given the trespasser's conduct indicates that he has not heard it or does not propose to obey it.

Moreover, the illustrations of this principle address our exact factual situation. Illustrations 3 and 4 both deal with trains striking pedestrians. Illustration 3 states:

> The engineer is entitled to assume that A knows of the approach of the train and will protect himself from harm by stepping off of the tracks before it reaches him. If, however, the engineer, after blowing the whistle, sees that A does not hear the warning or is unable or obviously intends not to obey it, the Railroad Company is subject to liability for running down A if the engineer fails to take reasonable care, after reaching a point 100 yards from A, to stop the train so as to avoid running A down.

Illustration 4 repeats this description of an engineer's duty:

> The Railroad Company is subject to liability if the engineer had seen A, obviously unable to get out of the way of the train, and the accident was due to his failure to exercise reasonable care thereafter to stop the train before it ran over A.

■ The duty of care expressed by the *Klouse* line of cases and the Restatement (Second), then, is that the engineer here owed no duty to Marilyn to slow or brake when he merely observed her on or near the tracks. Rather, a duty of reasonable care obtained only when he realized that she had stepped on the tracks and intended to stay there despite her obvious awareness of the train's approach.[2] Further, the *Klouse* cases and the Restatement (Second) should be read in conjunction with Washington's emergency doctrine. That doctrine provides that one who has not brought about the emergency is entitled to have the fact of emergency considered in determining the reasonableness of his or her conduct. *See, e. g., Egede-Nissen v. Crystal Mountain, Inc.*, 93 Wash.2d 127, 606 P.2d 1214, 1220–21 (1980) (en banc); *Sonnenberg v. Remsing*, 65 Wash.2d 553, 398 P.2d 728, 731 (1965).

In finding negligence, the district judge appears to rely heavily on the fact that the train was traveling at 60 miles per hour, a speed he determined unsafe in spite of the fact that it met all federal, state, local and company guidelines. Under Washington law as interpreted above, however, the train's speed prior to the engineer's duty of reasonable care does not control. Comment d, subsection 3, of section 336, Restatement (Second) of Torts (1965) states:

> A possessor of land, on the other hand, is subject to liability to a trespasser only if he fails to exercise reasonable care after the presence of the trespasser is perceived. If he then does all that a reasonable man would think necessary, he

**2.** Arguably the rule that an engineer need not brake until it is apparent that a trespasser intends to remain in peril also comports with Washington's test for proximate cause. *See King v. City of Seattle*, 84 Wash.2d 239, 525 P.2d 228, 234–35 (1974) (en banc) (legal liability determined upon mixed considerations of logic, common sense, justice, policy, and prece- dent). As the record reveals, pulling the emergency brake on a locomotive going 50 or 60 miles an hour always runs the risk of derailment. Given the frequency with which pedestrians walk on or near railroad tracks, requiring emergency procedures upon sight of pedestrians would be an unreasonable burden on the railroad and a safety hazard.

is not subject to liability when his careful action is defeated by inadequate preparation.

■ The proper factual question, then, becomes whether, once he finally determined Marilyn was not simply crossing the tracks but intended to stay, the engineer acted with reasonable care in that emergency situation. We disregard the findings that relate of this question because they were induced by an erroneous view of the law. *See United States v. Singer Manufacturing Co.*, 374 U.S. 174, 194 n.9, 83 S.Ct. 1773, 1783 n.9, 10 L.Ed.2d 823 (1963); *Rowe v. General Motors Corp.*, 457 F.2d 348, 356 n.15 (5th Cir. 1972). Because this error permeates the record, however, we are unable fairly to determine whether the engineer acted with reasonable care and therefore remand for a new determination of this issue.[3] *See Rowe*, 457 F.2d at 360.

### IV

### *Recreational Use Statute*

Union Pacific also argues that the district judge erred in holding inapplicable the Washington Recreational Use Statute.

As amended, the statute provides in pertinent part:

Any public or private landowners or others in lawful possession and control of any lands whether rural or urban, or water areas or channels and lands adjacent to such areas or channels, who allow members of the public to use them for the purposes of outdoor recreation, which term includes, but is not limited to, hunting, fishing, camping, picnicking, swimming, hiking, bicycling, the riding of horses or other animals, clam digging, pleasure driving of off-road vehicles, snowmobiles, and other vehicles, boating, nature study, winter or water sports, viewing or enjoying historical, archaeological, scenic, or scientific sites, without charging a fee of any kind therefor, shall not be liable for unintentional injuries to such users: *Provided*, That nothing in this section shall prevent the liability of such a landowner or others in lawful possession and control for injuries sustained to users by reason of a known dangerous artificial latent condition for which warning signs have not been conspicuously posted:

Wash.Rev.Code Ann. § 4.24.210 (Supp.1980). The express purpose of this statute is

to encourage owners or others in lawful possession and control of land and water areas or channels to make them available to the public for recreational purposes by limiting their liability toward persons entering thereon and toward persons who may be injured or otherwise damaged by the acts or omissions of persons entering thereon.

Wash.Rev.Code Ann. § 4.24.200 (Supp.1980).

The district court based its refusal to apply the doctrine on four key findings. First, the court found that Union Pacific was not a "landowner or other in lawful possession and control" of the tracks or the

---

**3.** Had the district court applied the proper legal principles, it may have found on this record that the engineer had acted with due care under the emergency circumstances. For example, when Marilyn stepped onto the tracks she was only about 250 feet in front of the train. The engineer did not apply the brakes immediately, but testified:

[W]hen she stopped in front of the engine, I knew right then that she had to keep either moving and go across or immediately return. And she stopped and stood on one foot and then the other foot and made some signs with her hands, and I went into emergency at that time. I don't know how far the distance was, but I realized this girl was in trouble, that is all.

The brakeman and others testified that the engineer applied the brakes "about" the time of impact. This testimony does not necessarily undermine the engineer's version of the story given the few seconds from observation to impact. Moreover, the district judge himself recognized that, once Marilyn appeared to linger on the tracks, the engineer's conduct was reasonable:

THE COURT: Counsel, I am convinced that Engineer Rook did everything that he was suppose to do at that time and place, that he said, 150 feet away, on the brakes, he did everything but throw out the anchor, and he probably would have done that if he had one. So I don't see what this witness is going to add to it.

Nonetheless, we decline to evaluate the cogency of such demeanor evidence.

right-of-way. This conclusion involves an interpretation of the 999 year contract signed in 1911 by the actual owner of the property, Burlington Northern, and Union Pacific.

Keeping in mind the expectation of the parties, a reasonable construction of the contract supports the view that Union Pacific is in lawful possession and control for purposes of this statute. For example, section 3 of the contract grants the property owner and Union Pacific "equal joint possession and use" of the tracks and right-of-way in question. While the owner has "general control, management and administration of the said railway and appurtenances", it is not permitted "to impair its usefulness" to Union Pacific. The contract further states that Union Pacific "shall have in every respect the same rights and privileges in the transaction of its business that the [owner] or any other user of the property has as to its business . . ." Additionally, the contract contains a provision automatically converting employees into "joint employees" when they engage in services for the common benefit of the two companies. And, importantly, even if Union Pacific fails to make payments, the owner cannot terminate the agreement unless the default continues for six months.

■ In short, one party necessarily retains administrative control to keep trains moving safely to their destinations, but Union Pacific cannot be ousted, and it may improve the facilities and make needed repairs. Under these facts, the district court erred in concluding that Union Pacific was not in lawful possession. *See McCarver v. Manson Park & Recreation District*, 92 Wash.2d 370, 597 P.2d 1362, 1363 (1979) (en banc) (finding possession and control "clear" under section 4.24.210 when U.S. government owned land upon which defendant operated park facilities); *cf. State ex rel. Tucker v. District Court*, 155 Mont. 202, 468 P.2d 773, 776 (1970) (Montana Supreme Court construing word "tenant" in similar statute to include company occupying land owned by the United States under a contract allowing use and occupation for a term of years).

Second, the court found that the "character of the use of the tracks and right-of-way in question was not such as would be for the 'purposes of outdoor recreation'." The undisputed facts show that Marilyn and her friends used the right-of-way as access to beaches otherwise inaccessible except by boat. Further, on the evening of the accident they congregated on the right-of-way to socialize. In a factually similar case, *Lovell v. Chesapeake & Ohio Railroad Co.*, 457 F.2d 1009 (6th Cir. 1972), the Sixth Circuit found Michigan's Recreational Use Statute fully applicable to immunize a railroad from liability for the death of a scout master who was struck as he walked along the train trestle on the way to a camping area. The court found that hiking along the tracks was for "recreational purposes".

■ Moreover, in Washington "[a] statute is to be construed with reference to its manifest object, and if the language is susceptible of two constructions, one of which will carry out and the other defeat the manifest object, it should receive the former construction." *Roza Irrigation District v. State*, 80 Wash.2d 633, 497 P.2d 166, 169 (1972) (en banc). Here the declared purpose of the act is to encourage those in possession of land to make it available to the public for recreational purposes. By not fencing the right-of-way, Union Pacific indirectly made the entire coastline available for such recreation. Whether a wise policy or not, it appears this is precisely what the Washington legislature wished to encourage by providing limited liability.

Third, the district court erroneously held that the engineer's *conduct* was not "unintentional" within the meaning of section 4.24.210. The statute refers to "unintentional injuries" to property users, not "unintentional conduct". We fail to see how the engineer and brakeman could be said to have intended Marilyn's injury.

Finally, the district court concluded that Marilyn's death was the result of a "known dangerous artificial latent condition". Again the district court erred as a matter of law. The injury resulted from an activity, not from a "condition of the land". See,

for example, *Potts*, 384 P.2d at 829–831, and Restatement (Second) of Torts §§ 334 and 335 for the distinction. Moreover, in no way could the presence of a speeding locomotive be considered "latent". The tracks, without more, put a reasonable person on notice that a train may appear. And, in this case Marilyn and her friends actually saw the train approach as it was some two or three miles away. *Cf. Bilbao v. Pacific Power & Light Co.*, 257 Or. 360, 479 P.2d 226 (1971) (rusty colored cable not visible from distance of eight to ten feet considered artificial latent condition).

 Although the district court erred in its findings and conclusions regarding the applicability of Washington's Recreational Use Statute, on this record we are unable to hold as a matter of law that Power's suit is barred by the statute. In addition to meeting the requirements discussed above, a defendant seeking the protection of section 4.24.210 must demonstrate that members of the public were *allowed* to use the land for recreational purposes. Here the district court failed to address this question, finding only that the area had been used "on a frequent basis" and that Union Pacific employees had "actual knowledge" of this use. On a more complete record we might conclude from these findings that Union Pacific allowed the public to use the area. Given that the district court and the parties concentrated on the common law negligence theory rather than the statutory immunity, however, we remand for consideration of this question.

## V

### Excessive Damages

The district court concluded that Frances Power had been damaged for loss of love and companionship of her daughter Marilyn "and for injury to and destruction of the parent-child relationship in the amount of . . . $400,000.00." Union Pacific claims this amount goes beyond the bounds of reason and has no support in the record.

 In Washington, the courts apply no fixed standard of value to loss of companionship, the amount of damages being left to the trier of facts. *See, e. g., Clark v. Icicle Irrigation District*, 72 Wash.2d 201, 432 P.2d 541, 545 (1967). A court will not reduce an award unless its "sense of justice is shocked by the amount . . ." *Id.*

Union Pacific claims, and our research confirms, that no court in Washington has awarded a figure remotely approaching $400,000 for this item of damage under similar circumstances.[4] We therefore conclude that the Washington courts probably would consider this award "shocking". On remand, then, if liability is established the district court should reconsider the award for loss of love and companionship.

The district court also found the present value of Marilyn's future wages plus fringe benefits to be $502,540.00. From this figure he deducted $167,500.20, or 40% of the total earnings, as "a reasonable deduction for personal expenses." The expense figure was based on the amount necessary "to sustain life". Citing *Balmer v. Dilley*, 81 Wash.2d 367, 502 P.2d 456 (1972) (en banc),

---

4. At trial the *only* evidence of such damage was presented by Marilyn's mother in the following colloquy:

Q. What was your relationship with Marilyn?
A. I think it was very close, closer than it was with the rest of my daughters when they were growing up, Marilyn was the type that I could get close to.
Q. Did you love Marilyn?
A. Very much.
Q. Mrs. Power, did Marilyn have an occasion to leave your home sometime prior to this accident?
A. She did at one time, she left for about four and five days, went on a little jaunt to California with three more kids, and she

returned home very remorseful and said that she would never go again, and everything was lovely between us then, everything was forgiven and I think she had learned her lesson.
Q. What year was Marilyn in school [at the time of the accidednt]?
A. I didn't hear you.
Q. What year was Marilyn in school, was she a sophomore, a junior?
A. She was going into high school, had graduated from the ninth grade—isn't that true, ninth,—no from the tenth.
Q. She had just graduated from the tenth?
A. Yes. She would have been a junior the next year, that is right.

the court rejected Union Pacific's claim that under Washington law personal expenses should include more than expenditures for subsistence living.

The *Balmer* case, read in conjunction with *Hinzman v. Palmanteer,* 81 Wash.2d 327, 501 P.2d 1228 (1972) (en banc), however, suggests the Washington courts would not accept a value based solely on subsistence. In *Balmer,* the court stated that the proper award would be "damages for loss of future earnings during his normal life expectancy, discounted to present worth, *with such other adjustments as the facts may require.*" 502 P.2d at 458 (emphasis added). Quoting *Hinzman,* the court explained that these adjustments are made by deducting "personal expenses" from "gross earning to reach the net." *Id.,* 502 P.2d at 459.

The *Balmer* court did not define "personal expenses". As Union Pacific correctly argues, however, the *Hinzman* court stated that "most" of the deductions such as "cost of living expenses, amount of gifts, expenses of entertainment, and expenses for medical attention expended during [the decedent's] normal life ... were arguably among those [items] which could be denominated 'personal expenses.'" 501 P.2d at 1232. *Cf. Gonyer v. Russell,* 160 F.Supp. 537, 540 (D.R.I.1958), *aff'd on other grounds,* 264 F.2d 761 (1st Cir. 1959) (cited by the *Hinzman* court in support of its "personal expenses" standard, and stating that a court should scrutinize an individual's life style to determine "personal living expenses".) We remand, then, in light of *Hinzman.*

REVERSED and REMANDED.