**Ralph S. SLOTTOW; Fidelity Federal Bank, Plaintiffs-counter-defendants-Appellees,**

v.

**AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, Defendant-counter-claimant-Appellant.**

**Ralph S. SLOTTOW, Plaintiff-counter-defendant,**

and

**Fidelity Federal Bank, Plaintiff-counter-defendant-Appellant,**

v.

**AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, Defendant-counter-claimant-Appellee.**

Nos. 91–55698, 91–55804.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 3, 1993.

Decided Aug. 4, 1993.

As Amended on Denial of Rehearing and Suggestion for Rehearing En Banc Dec. 6, 1993.

Radcliff & West, Los Angeles, CA, and Barry R. Levy, Christina J. Imre, Stephen E. Norris, George P. Schiavelli, Horvitz & Levy, Encino, CA, for American Cas. Co. of Reading, Pa.

Dennis M. Perluss, Margot A. Metzner, Hufstedler, Kaus & Ettinger, Ralph B. Perry III, Lawrence S. Graven, Howard B. Brody, Graven Perry Block Brody & Qualls, Los Angeles, CA, for Fidelity Federal Bank.

Before: BROWNING, HUG, and KOZINSKI, Circuit Judges.

KOZINSKI, Circuit Judge:

This coverage dispute between a bank and an insurance company involves a directors and officers' liability policy. The appeal raises various issues, the most significant among them being, under which circumstances is it appropriate to award punitive damages against an insurance company for choosing to contest coverage?

## Background

Fidelity National Trust is a subsidiary of Fidelity Federal Bank. In the 1980s, FNT served as trustee for investors in loan pools underwritten by Commercial Acceptance Corporation. Ralph S. Slottow, President of FNT (who was also an officer and director of the bank), signed and supervised the trust agreements for the investments. Disgruntled CAC investors sued CAC in state court for fraud, claiming the entire venture had been a Ponzi scheme. The investors alleged Slottow, FNT and the bank were to blame, too, for lax enforcement of the trust agreements; they sued them for breach of contract, negligence and breach of fiduciary duty.

The Superior Court granted summary judgment for Slottow on the contract claim, but denied it on the negligence and breach of fiduciary duty claims. In the shadow of liability for the remaining claims, Slottow and FNT settled the CAC suit for $4.75 million. The bank in turn indemnified Slottow for the amount of the settlement, along with his fees and expenses; the bank also picked up FNT's part of the tab. In approving the settlement payments, the bank's Board of Directors allocated them as follows: $0 to the bank itself; $170,000 (4%) to FNT; and $4.58 million (96%) to Slottow. See Exh. 337.

The Association to which the bank (and also FNT) belong held a D & O policy with American; the bank sought reimbursement under the policy for the amount paid on Slottow's behalf. American refused, maintaining that Slottow's actions as President of FNT weren't covered by the policy, that the bank had failed to exhaust the policy's retention (deductible) and that too much of the settlement was allocated to Slottow. In response, Slottow and the bank sued American in the Central District of California for declaratory relief, breach of contract and breach of the implied covenant of good faith and fair dealing for its refusal to reimburse the bank. American counterclaimed, seeking declaratory relief as to the policy's retention provision and the allocation of the settlement.

The district court ruled prior to trial that the retention was $10,000, not $500,000 as American had urged. It also ruled that Slottow's actions at FNT were indeed covered by the policy, but it deferred ruling until trial on whether American's failure to pay amounted to bad faith. After a bench trial, the court essentially approved the settlement allocation, although it did increase FNT's share slightly, to $350,000; the remaining $4.4 million was left to Slottow. The court also found American had acted in bad faith in several respects. The total judgment was $10,358,586, of which $5,000,000 was punitive damages. Finally, the court denied the bank's request for costs and fees. Both sides appeal.

## I

■ American argues the district court erred in holding the D & O policy obligated it to reimburse the bank for Slottow's actions. Because the bank prevailed on summary judgment as to this issue, we review de novo. *E.g., T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 629 (9th Cir.1987).

Clause (b) of the policy requires American to reimburse the bank for "all Loss for which the Association is required to indemnify or for which the Association has, to the extent permitted by law, indemnified the Directors or Officers." Exh. 303 at 2. The governing regulation, 12 C.F.R. § 545.121(f), states that "an association which has a bylaw in effect relating to indemnification of its personnel shall be governed solely by that bylaw." We therefore look to the bank's bylaws to determine whether the bank was required or permitted to indemnify Slottow; if it was, then American was obligated to reimburse the bank.

■ Article III, section 14 of the bylaws states the "Association shall indemnify any person against whom an action is brought or threatened because that person is or was a director, officer, or employee of the Association." ER 152 at 23. The policy defines "Association" to include "any Subsidiary as defined in Clause 1(f)," exh. 303 at 2; "the term 'Subsidiary' as defined in Clause 1(f) of the Policy ... include[s] ... Fidelity National Trust Company," *id.* at 23. The import of these provisions, taken together, is clear: The bank must indemnify any director or officer of the Association (which includes FNT) for any actions brought against him in his official capacity. Slottow was sued because he allegedly was negligent in managing FNT's operations, causing financial harm to the CAC investors. Liability for Slottow's actions is therefore covered by the policy.

American asserts that permitting the bank to indemnify Slottow for his activities on behalf of FNT violates 12 C.F.R. § 545.121. It argues that a bank may only indemnify persons for liability incurred "in their capacity as directors, officers, or employees" of the indemnifying association, 12 C.F.R. § 545.-121(d); thus the bank cannot indemnify Slottow in his capacity as an *FNT* officer, since FNT is a separate corporate entity from the bank. But the policyholder is the Association, of which both the bank and FNT are members. Furthermore, as we shall see, American argues with some force that the bank is the alter ego of FNT. *See* p. 1360 *infra.* Because Slottow's duties at FNT were performed at the bank's behest, it was perfectly appropriate for the bank to indemnify him for liability incurred in discharging those duties, even though he served a subsidiary corporation as well.

American also argues that, because the Association and Slottow entered into an indemnity agreement apart from the general indemnity provision of Article III of the bylaws, the reimbursement to him was made pursuant to this agreement, not pursuant to the bylaws. This is sophistry. As the bank was obligated by the bylaws to reimburse Slottow, the fact that it was also required to do so by virtue of an agreement doesn't change the fact that it had an obligation under the bylaws. Whatever other effect it may have had, the bank's reimbursement of Slottow satisfied its obligation under the bylaws.

Accordingly, the district court correctly determined that American had to reimburse the bank under the D & O policy for Slottow's share of settlement.

## II

American appeals from the district court's ruling that the allocation of the settlement between Slottow, the bank, FNT and the investors in the underlying action was a good faith settlement. A "settlement ... made in good faith" prevents later claims of indemnity from other joint tortfeasors. Cal.Civ.Proc. Code § 877.6(c). In approving the settlement, the bank's board of directors allocated 96% to Slottow, 4% to FNT and 0% to the bank. Although the district court adjusted the allocation slightly—diminishing Slottow's share to 93% and raising FNT's to 7%—it found that the "allocation arrived at by the Fidelity Federal board bore a reasonable relationship to the relative exposure of the parties to the underlying litigation." ER 184

at 10. We treat the district court's ruling as to a good faith settlement as a finding of fact, which we reverse "only upon a showing that it was clearly erroneous because of lack of evidentiary support or erroneous application of law." *Owen v. United States,* 713 F.2d 1461, 1466 (9th Cir.1983) (California law). But we review de novo the legal conclusions undergirding the court's factual findings. *E.g., Power v. Union Pacific R.R. Co.,* 655 F.2d 1380, 1382–83 (9th Cir.1981).

■ A settlement was not entered in good faith if it doesn't reasonably reflect the parties' relative liabilities. *Owen,* 713 F.2d at 1466. We therefore reject the bank's initial argument that we should consider the parties' allocation of the settlement to be conclusive. "We find ... no justification for giving presumptive effect to an allocation that is not the product of adverse negotiation. A presumption that the parties have reasonably allocated a settlement amount ... should be reserved for a settlement by parties with truly adverse interests in the allocation. Where the parties have purported to settle an imaginary dispute over allocation, that allocation should be given no special treatment in an indemnity action." *Peter Culley & Assoc. v. Superior Court,* 10 Cal.App. 4th 1484, 1497–98, 13 Cal.Rptr.2d 624 (1992) (citation omitted).

This is exactly our case. Slottow and the bank didn't have adverse interests; on the contrary, each had a strong incentive to structure the settlement precisely as it did. The bank faced liability as the alter ego of FNT; it knew it could avoid costly liability and public ignominy by allocating 0% of the liability to itself and 96% to Slottow. And the bank knew it could indemnify Slottow— who also sat on the bank's Board—while being fully reimbursed by American under the terms of the policy. Slottow and the bank thus crafted a win-win solution for themselves, with the insurance company footing the bill.

Far from deferring to allocations such as these, we view them with considerable suspicion because of the risk that liability may have been allocated for strategic reasons, as almost certainly happened here. We can't blame the bank or Slottow for trying to structure the settlement in a manner that best served their interests; but we can't let their allocation bind American. *See Pacific Estates, Inc. v. Superior Court,* 13 Cal.App. 4th 1561, 1573–74, 17 Cal.Rptr.2d 434, 442–43 (1993).

Under California law, the district court was required to determine that the allocation of defendants' respective shares of the total settlement award reasonably reflected, among other things, their "proportional share of comparative liability for the plaintiff's injuries" and their financial ability to satisfy a judgment. *Tech–Bilt, Inc. v. Woodward–Clyde & Assocs.,* 38 Cal.3d 488, 499, 213 Cal.Rptr. 256, 698 P.2d 159 (1985). We must look to whether the "settlement ... reflect[ed] a good-faith estimate of the relative liabilities of the parties at the time of settlement." *Owen,* 713 F.2d at 1466; *see also Xebec Dev. Partners, Ltd. v. National Union Fire Ins. Co.,* 12 Cal.App. 4th 501, 549, 15 Cal.Rptr.2d 726 (1993).

■ The district court rested its determination that Slottow was responsible for 93% of the settlement on a variety of factors: the opinion of the investors' counsel that their claims against Slottow were strong; statements by Slottow's lawyer that his client faced substantial liability; and the action of the bank's Board of Directors in allocating the lion's share of the settlement to Slottow. Yet the contract claim against Slottow had been dismissed on summary judgment before settlement, leaving only the negligence and breach of fiduciary duty claims. Although Slottow may have faced liability *to the bank* for his mistakes, "a corporation's employees owe no independent fiduciary duty to a third party with whom they deal on behalf of their employer." *Grosvenor Properties Ltd. v. Southmark Corp.,* 896 F.2d 1149, 1154 (9th Cir.1990) (California law); *accord United States Liab. Ins. Co. v. Haidinger–Hayes, Inc.,* 1 Cal.3d 586, 595, 83 Cal.Rptr. 418, 463 P.2d 770 (1970). The mere fact that Slottow signed the agreements in the ordinary course of his duties as President of FNT does not convert his actions into the type of personal direction or participation in the tort that would expose him to substantial risk of personal liability. *See Self–Insurers' Security*

*Fund v. ESIS, Inc.,* 204 Cal.App.3d 1148, 1162–63, 251 Cal.Rptr. 693 (1988). By assigning 93% of the liability to Slottow, the district court significantly overestimated Slottow's personal exposure in the underlying litigation.

At the same time, the district court probably underestimated FNT's potential liability and certainly underestimated the bank's. Without a doubt, the one party that faced the greatest exposure in the state court lawsuit was FNT: If anyone had a direct duty of care to the investors, FNT was it; moreover, it was the only party to the trust agreements, and undoubtedly faced substantial liability for its actions. Yet the settlement only allocated $170,000 of a $4.75 million dollar settlement to FNT—a scant 4%. ER 184 at 10 (findings below). Although the district court doubled this amount to $350,000 (the amount of FNT's net worth), this was still only about 7% of the total settlement—far too low in light of the fact that (deep pockets aside) FNT was the principal defendant in the state court action.

In equating FNT's liability with its net worth, the district court apparently assumed FNT's exposure could not exceed the value of its assets. But the ability to collect a judgment directly from FNT is only one factor to be taken into account in evaluating the reasonableness of the allocation of the settlement to FNT. *See Woodward–Clyde & Assocs.,* 38 Cal.3d at 499, 213 Cal.Rptr. 256, 698 P.2d 159. While the plaintiffs could have collected no more than the value of FNT's assets from FNT itself, there was a strong likelihood they would have collected much more than that from the bank on an alter ego theory. Thus, the district court should have increased the amount of FNT's liability in proportion to the likelihood the plaintiffs would be able to recover some of the judgment against FNT from the bank.

■ And, in fact, the plaintiffs in the underlying action had an excellent argument under an alter ego theory for piercing the corporate veil. To begin with, FNT's initial

capitalization of $500,000 was woefully inadequate for a corporation that handled trust agreements of the magnitude involved here. The investors claimed damages in the range of $10,000,000; the case settled for nearly half that. Under California law, inadequate capitalization of a subsidiary may alone be a basis for holding the parent corporation liable for acts of the subsidiary. *See, e.g., Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec,* 854 F.2d 1538, 1544 (9th Cir.1988) (citing *Minton v. Cavaney,* 56 Cal.2d 576, 15 Cal.Rptr. 641, 364 P.2d 473 (1961)).[†]

■ California law also allows the corporate form to be disregarded when there is unity of interest and ownership between the two corporations, and an inequitable result would follow if the corporations were treated as separate entities. *Mesler v. Bragg Management Co.,* 39 Cal.3d 290, 300, 216 Cal. Rptr. 443, 702 P.2d 601 (1985). The bank owned 100% of Citadel Service, which in turn owned 98% of FNT. All of FNT's officers—most especially Slottow himself—were officers of the bank. Other relevant factors are the use of the same business location, the same lawyers, the failure to maintain arms' length transactions between the entities, representations that the parent's assets will cover the subsidiary's debts—all of which were present here. *See United Community Church v. Garcin,* 231 Cal.App.3d 327, 343, 282 Cal.Rptr. 368 (1991) (Spencer, P.J., concurring).

■ It is not entirely clear what the bank's exposure was in light of these factors, but it certainly was much more than zero. Indeed, had plaintiffs managed to pierce the corporate veil, the bank would have been on the hook for the entire judgment. Thus the bank's exposure was precisely that of FNT, discounted by the possibility the bank could have preserved the corporate form.

### III

■ We next address American's argument that the district court erred in ruling

---

† The bank's reliance on the Office of Comptroller of the Currency's approval of FNT's initial capitalization is unavailing because that approval was dependent on FNT's affiliation with the bank—and its deep pocket. *See* ER 104 at 96. This makes it more likely the bank would have been required to shoulder some of FNT's liability.

the appropriate retention (deductible) for the policy was $10,000. American argues the retention was $500,000. The dispute turns on the following language:

It is understood and agreed that item 4 of the Declarations is hereby amended to read as follows:

[$]10,000 each Director of Officer each Loss, but in no event exceeding

$100,000 in the aggregate each Loss all Directors and Officers Liability under Insuring Clause (a)

$500,000 in the aggregate each Loss under Company Reimbursement Insuring Clause (b).

Exh. 303 at 30. According to American, the $10,000 per officer or director per loss retention applies only to Clause (a); Clause (b) has a flat $500,000 retention. The bank, on the other hand, argues the $10,000 retention applies to claims under either Clause (a) or (b). According to the bank, it's responsible for a $10,000 retention for each loss it suffers as a result of its D & O claims under Clause (b), but no more; the $500,000 is not a deductible but a ceiling the individual $10,000 retentions may not exceed. The difference in this case between the two interpretations is $490,000.

The problem is, the retention provision lacks the punctuation necessary for us to ascertain its meaning. A colon after "exceeding" would have made it apply equally to both clauses; a semicolon after "Insuring Clause (a)" would have limited the $10,000 cap to Clause (a). As written, the policy provides no clue on this question, so we resolve the dispute based on the canon of construction that ambiguities in a written instrument are resolved against the drafter. *E.g., Consolidated Am. Ins. Co. v. Mike Soper Marine Servs.*, 951 F.2d 186, 188–89 (9th Cir.1991) (California law). American could have written the policy so as to eliminate the ambiguity by inserting what is obviously missing from this provision—punctuation. We see no reason to give it the benefit of the doubt created by its own careless drafting. We therefore affirm the district court's interpretation of the retention provision.

## IV

The district court also held American breached the implied covenant of good faith and fair dealing. Specifically, it found American acted in bad faith in opposing the bank's settlement allocation; it also found that American failed to investigate its obligations, offer arbitration or pay Slottow's attorney's fees in the underlying litigation. The court also faulted American for maintaining Slottow wasn't covered by the policy, and for its interpretation of the split retention agreement. ER 184 at 12–14. The court imposed $5,000,000 in punitive damages. *Id.* at 16–17. Only the award of punitive damages and the denial of attorney's fees are being appealed. We review a district court's findings of bad faith for clear error, *In re Wolverton Assocs.*, 909 F.2d 1286, 1292 (9th Cir.1990), and the underlying legal rulings de novo, *Power v. Union Pac. R.R. Co.*, 655 F.2d at 1382–83.

Punitive damages aren't available in California for simple breaches of contract, no matter how willful. *Tibbs v. Great Am. Ins. Co.*, 755 F.2d 1370, 1375 (9th Cir.1985). Rather, the breach must have been tortious, and the breaching party must have "been guilty of oppression, fraud, or malice," Cal. Civ.Code § 3294; *see also Silberg v. California Life Ins. Co.*, 11 Cal.3d 452, 462–63, 113 Cal.Rptr. 711, 521 P.2d 1103 (1974); *Mock v. Michigan Millers Mutual Ins. Co.*, 4 Cal. App. 4th 306, 327, 5 Cal.Rptr.2d 594 (1992); *Patrick v. Maryland Casualty Co.*, 217 Cal. App.3d 1566, 1575, 267 Cal.Rptr. 24 (1990). Put another way, punitive damages are recoverable only where the defendant "act[ed] with the intent to vex, injure, or annoy." *Neal v. Farmers Ins. Exch.*, 21 Cal.3d 910, 922, 148 Cal.Rptr. 389, 582 P.2d 980 (1978) (citation omitted).

We apply this standard in light of the relative economic power, sophistication and legal expertise of the parties. What might be acceptable behavior between two large corporations butting heads in the marketplace looks quite different when there is a substantial difference in economic power or sophistication between the parties. Indeed, California cases upholding punitive damages typically do so in cases involving small plaintiffs, usually ones that are in distress of one

form or another. In *Neal*, for example, punitives were proper where the insurance company deliberately capitalized on the "lamentable circumstances in which Mrs. Neal and her family found themselves, and the exigent financial situation resulting from it." 21 Cal.3d at 923, 148 Cal.Rptr. 389, 582 P.2d 980. Likewise *Betts v. Allstate Ins. Co.*, 154 Cal.App.3d 688, 201 Cal.Rptr. 528 (1984), imposed punitive damages on Allstate where it had "wilfully manipulated its own client through ... coaching, encouraging a patently unreasonable belief in 17–year–old Betts that she had not run the red light." *Id.* at 709, 201 Cal.Rptr. 528; *see also Nolin v. National Convenience Stores, Inc.*, 95 Cal.App.3d 279, 288, 157 Cal.Rptr. 32 (1979).

 What we have here is a much different situation. Fidelity Federal Bank is a federally chartered savings bank and owns several financial institutions, including FNT. It has ready access to legal advice and controls substantial assets, placing it on relatively equal footing with American. Neither the bank nor American faced a threat to its existence or financial stability because of this dispute; each simply went about its business while the controversy percolated. Such rough equality of economic power and sophistication precludes a finding of oppression; American's refusal to pay the claim simply could not have oppressed the bank.

Nor does the record support a finding that the insurance company acted fraudulently. American had a different interpretation of the contract than the bank, and was perfectly up front about it. Nor was there a showing that American acted with malice; this was a contract dispute, where each side advanced its position aggressively, nothing more. We therefore cannot find evidence supporting an implicit finding that American acted with intent to "vex, injure or annoy." It is possible, of course, that the filing of a lawsuit itself is done to vex, injure or annoy another party, but seldom do commercial disputes rise to this level. Disagreement over insurance coverage—so long as the issues disputed are bona fide—is an ordinary cost of doing business. Nothing in California law suggests a refusal to provide coverage as requested by an insured, when the refusal is supported by a reasonable, good faith argument, can form the basis for punitive damages.

Here American won on some of its claims and it lost on others. All its arguments were plausible; none was laughable. There was no showing American tried to take advantage of the bank's vulnerability, or that it denied any of the claims hoping it could get the bank to settle for less than American knew it was entitled to. Under these circumstances, the award of punitive damages cannot be sustained.

 The district court imposed punitive, but not compensatory damages for American's breach of the covenant of good faith and fair dealing. Because we reverse the award of punitive damages, that leaves only the bank's appeal from the denial of the award of attorney's fees as damages: Oddly, the bank did not appeal the denial of ordinary compensatory damages. Attorney's fees, while recoverable when an insurer has acted tortiously, are limited to the amount due under the policy; fees expended on obtaining amounts in excess of the policy, such as consequential damages, aren't recoverable. *Brandt v. Superior Court*, 37 Cal.3d 813, 817–19, 210 Cal.Rptr. 211 (1985). Because the bank made no effort to segregate its litigation expenses as required by *Brandt*, we affirm the district court's decision not to award fees.

Finally, the bank asks us to remand (rather than affirm) on the issue of fees so it may prove up its damages, i.e., do the necessary segregation of fees which *Brandt* requires. But *Brandt*'s rule is not new; the bank has no excuse for failing to comply with it the first time around. We therefore decline the bank's invitation to remand, and affirm the denial of fees.

**AFFIRMED IN PART, REVERSED IN PART and REMANDED.**