[No. 34029. Department Two. June 13, 1957.]

STANLEY E. KLOUSE et al., *Respondents*, v. NORTHERN PACIFIC RAILWAY COMPANY et al., *Appellants.*[1]

[1]Reported in 312 P. (2d) 647.

*Brown, Hovis & Cockrill, Dean H. Eastman,* and *Roscoe Krier,* for appellants.

*Robert A. Felthous* and *Robert F. Brachtenbach,* for respondents.

ROSELLINI, J.—This action concerns an accident in which the plaintiff Klouse, driving a 68-foot tractor and trailer (hereafter referred to as a truck) belonging to his employer, the plaintiff West Coast Fast Freight, Inc., collided with a four-unit, 200-foot, diesel locomotive belonging to the defendant and cross-complainant Northern Pacific Railway Company and operated by the defendant Peter Meyer.

The complaint contained a number of allegations of neg-

ligence, including allegations that the defendants were operating the locomotive at an excessive rate of speed without adequate lights, and had failed to warn the plaintiff Klouse of the train's approach. Further negligence was alleged, in that those in charge of the train failed to take advantage of the last clear· chance to avoid the accident. In their answer, the defendants denied that they were negligent in any particular and alleged that the accident was due solely to the negligence of the plaintiff Klouse. In its cross-complaint, Northern Pacific Railway Company asked compensation for the damage done to the locomotive, which was struck approximately twenty-eight feet from the front of the leading unit by the truck.

The jury returned a verdict in favor of the plaintiffs, and the defendants have appealed, assigning error to the denial of various motions and the giving and refusing of instructions.

The accident in question occurred on a dark but clear night, at approximately 2:00 a. m., on February 11, 1955, at a point where Meade avenue crosses track No. 2 in the Northern Pacific freight yard in the city of Yakima. The plaintiff Klouse drove his truck out of the West Coast Fast Freight terminal, which is about two thousand feet west of the railroad tracks, and proceeded east toward the crossing. As he reached the most westerly pair of tracks, where the crossing signal is located (54 feet west of track No. 2), he looked both ways and slowed down, but did not stop. He did not observe the signal operating and did not see a train upon the tracks until he was about halfway .between the signal and track No. 2. When he became aware of the approaching train, which was then only about 15 to 18 feet from the crossing, he applied his brakes and skidded into the locomotive as the first unit passed over the crossing.

Shortly before the accident occurred, the locomotive had come in to the yard and had detached its freight cars north of Meade avenue. It then proceeded south across Meade avenue to a switching station one-half mile south of.Meade avenue, where it was switched from track No. 1 .to track

No. 2. When this was accomplished, the engineer was seated in the rear unit and was operating the locomotive from that position, since the power was out on the two leading units. The fireman, who had control of the brakes and the whistle, sat with the head brakeman in the leading unit. He testified that he turned on the headlight and the interior lights, and that as the locomotive approached the crossing, returning north toward the roundhouse, he sounded the signal-crossing warning. All three of the men on the train testified that they observed the approaching vehicle when it was some 600 to 800 feet from the crossing. It appeared to be traveling at a speed of about 25 to 30 miles per hour. They kept their eyes upon it, as it was the only vehicle in sight. When it failed to stop at the signal (which, according to their testimony, was flashing), the fireman reached for the brake handle, but at the same moment the brakes were applied by the engineer.

The engineer stated in his testimony that when the truck was within 300 feet of the track, it was in the danger zone, meaning, as he said, that one or the other would have to do something to avoid a collision. The train was proceeding at "yard speed," or approximately 12 miles per hour, and at that speed, under ordinary conditions, it could stop in 85 feet. In this case, a greater stopping distance was actually required, because the impact of the truck punctured the oil tank and a large quantity of oil was spilled on the tracks, which caused the train to slide.

At the rate of speed at which the truck was traveling, 20 miles per hour, its stopping distance was 35 feet.

An engineer called by the defendants testified that when one proceeding east on Meade avenue reaches a point 200 feet from track No. 2, he has an unobstructed view of the tracks as far south as the switching station, or a distance of 2175 feet.

Some of the assignments of error concern the court's failure to give instructions pertaining to the negligence of the plaintiff Klouse. The court instructed the jury that Klouse was negligent, as a matter of law, in failing to operate his

vehicle in such manner that he might bring it to a complete stop within ten feet of the nearest track. This negligence alone, being unquestionably a proximate cause of the accident, was enough to bar the plaintiff's recovery unless the doctrine of last clear chance was applicable, and the defendants were not harmed by the failure to give the requested instructions.

On the other hand, we are convinced that this is not a case in which the doctrine of last clear chance can be applied. That doctrine, as often enunciated by this court, gives to a party guilty of contributory negligence the right to recover in spite of his own negligence if the defendant had an opportunity to avoid the accident and failed to take advantage of it.

The application of the doctrine to a state of facts disclosed by evidence introduced in a jury trial is a question of law to be determined by the court. *Sarchett v. Fidler*, 37 Wn. (2d) 363, 223 P. (2d) 843; *Stokes v. Johnstone*, 47 Wn. (2d) 323, 287 P. (2d) 472. The last clear chance rule, as applied in Washington, has two phases. In the one, the plaintiff's negligence may continue up to the time of the injury if the defendant actually sees the peril; in the second, the plaintiff's negligence must have terminated or culminated in a situation of peril from which the plaintiff could not by the exercise of reasonable care, extricate himself if the defendant did not actually see the peril, but in the exercise of reasonable care should have seen it. *Coins v. Washington Motor Coach Co.*, 34 Wn. (2d) 1, 208 P. (2d) 143; *Leftridge v. Seattle*, 130 Wash. 541, 228 Pac. 302; *Everest v. Riecken*, 30 Wn. (2d) 683, 193 P. (2d) 353. However, in order to hold a defendant liable under this rule, it must appear that he had a clear chance to avoid the accident, not merely a possible chance; and a clear chance to avoid an accident involves the element of sufficient time to appreciate the peril of the party unable to extricate himself and to take the necessary steps to avoid injuring him. *Everest v. Riecken, supra.* As this court said in *Steen v. Hedstrom*, 189 Wash. 75, 63 P. (2d) 507, and in *Everest v. Riecken, supra,*

"Last clear chance implies thought, appreciation, mental direction, and the lapse of sufficient time to effectually act upon the impulse to save another from injury."

In *Barrett v. Inglin,* 46 Wn. (2d) 317, 281 P. (2d) 236; and in *Pasero v. Tacoma Transit Co.,* 35 Wn. (2d) 97, 211 P. (2d) 160, we refused to apply the doctrine in cases involving intersection collisions wherein the defendant had the right of way, and in *Myers v. West Coast Fast Freight,* 42 Wn. (2d) 524, 256 P. (2d) 840, we held that the driver of a truck, who applied his brakes as soon as he saw that a pedestrian standing on the highway was not going to yield the right of way, had done all that was required of him, and an instruction on last clear chance was properly refused.

Regarding the duties of an operator of a locomotive, in *Sadler v. Northern Pac. R. Co.,* 118 Wash. 121, 203 Pac. 10 (followed in *Spokane County v. Great Northern R. Co.,* 178 Wash. 389, 35 P. (2d) 1; and *Hopp v. Northern Pac. R. Co.,* 20 Wn. (2d) 439, 147 P. (2d) 950, we said:

"One operating a locomotive and train has a right to assume, until the contrary becomes evident, that one approaching the track in an automobile will give the train the right of way, and is not required to attempt to bring his train to a standstill because the automobile may be seen to be approaching the track; but has a right to assume, until the contrary appears, that the occupants of such automobile will use reasonable care for their protection, and will give the train the right of way to which it is entitled under the law."

Applying that doctrine to this case, until the driver of the truck failed to stop at the signal, it is manifest that those in charge of the train had no reason to think that he would not stop and yield the right of way. Although Klouse did not observe the signal nor the train until it was almost upon him, other witnesses testified that the signal was operating, the train was lighted, and the horn was sounded four times. There was no reason why the operator of the locomotive should assume that the driver of the truck, who had an unobstructed view, was unaware of the approaching locomotive on the tracks. When the truck reached the

signal, it was 54 feet from the track occupied by the train; and if it was traveling at the rate of 20 miles an hour at that point, as the driver testified, it would reach the track in less than two seconds. (The number of feet per second equals approximately one and one-half times the speed of the vehicle). The train, traveling at 12 miles an hour, would travel 36 feet in that length of time. It could not possibly stop in time to avoid the collision. If it be speculated that a warning signal would have drawn the attention of Klouse, it must be borne in mind that he observed the train and began to apply his brakes about 25 feet beyond the signal, that is to say, within one second after he had passed the signal. It cannot be suggested that the fireman could perceive the peril and sound the horn, and the driver could hear the horn, form a judgment and apply his brakes, all in less than one second. It defies reason to suppose that, at this point, those in charge of the locomotive had a *possible* chance, much less a *clear* chance, to avoid the collision.

The respondents rely heavily upon the case of *Locke v. Puget Sound International R. & Power Co.,* 100 Wash. 432, 171 Pac. 242. In that case, the plaintiff, who was lame and claimed also to be deaf, drove his tricycle in front of a street car and was injured. The operator saw him starting diagonally across the street, sounded his gong, and observed that he paid no attention. The defendant was held liable under the doctrine of last clear chance. The case is distinguishable in at least two respects. The inattention of the plaintiff was observed by the operator of the street car *in time* to avoid the accident, and the street car did not have the right of way. In *Hynek v. Seattle,* 7 Wn. (2d) 386, 111 P. (2d) 247, we drew this distinction between the duties of an operator of a street car and those of an operator of a railroad train: the "stop, look and listen" rule applied in railroad cases is not applied to street car cases, and the same degree of care is required of operators of street cars as is required of pedestrians or others who cross over the street car tracks. Each party has the right to assume that the other will exercise reasonable and ordinary care to avoid accidents.

Since the doctrine of last clear chance does not apply in this case, and since the plaintiff Klouse, agent of the plaintiff West Coast Fast Freight, Inc., was negligent *per se,* the plaintiffs are not entitled to recover.

The defendant Northern Pacific Railway Company has made no argument and has asked for no relief in regard to its cross-complaint; therefore, it will be deemed abandoned.

The judgment is reversed.

HILL, C. J., SCHWELLENBACH, DONWORTH, and FOSTER, JJ., concur.

August 14, 1957. Petition for rehearing denied.

[1]Reported in 312 P. (2d) 661.