2000 UT App 333

**Daniel D. PRICE, Susanne Q. Price, Kent Swensen, Kay Swensen, Ross Larrabee, and Carma Larrabee, Plaintiffs and Appellants,**

v.

**NATIONAL RAILROAD PASSENGER CORPORATION; Southern Pacific Transportation Company, a Delaware corporation; and South Jordan City, a Utah municipal corporation, Defendants and Appellees.**

No. 990554–CA.

Court of Appeals of Utah.

Nov. 24, 2000.

David Jordan, Mark E. Hindley, Stoel, Rives, LLP, Salt Lake City, and Richard P.R. Cohn and Robert A. Schuetze, Cortez, Macaulay, Bernhardt & Schuetze, LLC, Denver, CO, for Appellants.

Allan L. Larson, Snow, Christensen & Martineau, E. Scott Savage, and Casey K. McGarvey, Berman, Gaufin, Tomsic, Savage & Campbel, Salt Lake City, for Appellees.

Before Judges BILLINGS, ORME, and THORNE.

## OPINION

BILLINGS, Judge:

¶ 1 This wrongful death action arose from a collision between a train and car, which resulted in the deaths of the car's occupants. The decedents' parents (Plaintiffs) appeal summary judgment for the National Railroad Passenger Corporation (Amtrak), Southern Pacific Transportation Company (Southern Pacific) (collectively Railroad Defendants) and the City of South Jordan, Utah (South Jordan). We affirm.

## BACKGROUND

¶ 2 This case arose out of a tragic accident in which an Amtrak train struck a car driven by one of Plaintiffs' children, and in which the other Plaintiffs' children were passengers. All occupants of the car died from injuries sustained from the accident.

¶ 3 The accident occurred where Third West Street crosses the tracks at 10200 South in South Jordan. The crossing is marked by cross bucks [1] and a stop sign. A sign indicating an upcoming jog in the road, the railroad crossing, and a stop ahead sign are located on the north-south segment of the highway before the jog in the road is reached.

¶ 4 On the night of December 31, 1995, the decedents were traveling north on Third West in the second of a group of three cars. Decedents' friends were in the other two cars. When the group reached the crossing, the first car either stopped or came to a rolling stop, then proceeded successfully across the tracks in front of an approaching train.

¶ 5 The car carrying the decedents came to a full stop at the crossing for up to three seconds, then began to cross the tracks. The train, which was traveling at about 68 miles per hour, struck the car resulting in fatal injuries to the occupants.

¶ 6 The parents of the decedents brought the present wrongful death action alleging negligence by all Defendants. Plaintiffs alleged the 10200 South railroad crossing was more than ordinarily hazardous, which the trial court assumed for purposes of considering Defendants' motions for summary judgment. Plaintiffs claimed the Railroad Defendants should have upgraded the warning devices or urged the Utah Department of Transportation (UDOT) to do so. Plaintiffs further claimed Amtrak negligently failed to slow its train as it approached the crossing, failed to provide adequate audible warning as the train approached the crossing, and failed to brake the train when the collision became imminent. Plaintiffs also claimed

Southern Pacific failed to order Amtrak to slow Amtrak's trains through the crossing. Finally, Plaintiffs claimed South Jordan negligently installed and maintained the passive warning devices at the crossing and negligently failed to upgrade the passive warning devices. The trial court granted Defendants' motions for summary judgment on all claims. Plaintiffs appeal.

¶ 7 Summary judgment is appropriate when there are no issues of material fact and the moving party is entitled to judgment as a matter of law. See Utah R.Civ.P. 56(c). We review a grant of summary judgment for correctness. See Winters v. Schulman, 1999 UT App 119, ¶ 9, 977 P.2d 1218.

## ANALYSIS

I. Claims Against Railroad Defendants

A. Railroad Defendants' Duty to Upgrade Warning Devices

■ ¶ 8 Plaintiffs argue the Railroad Defendants had a duty to upgrade the warning devices at the crossing or to urge UDOT to do so because the crossing is more than ordinarily hazardous. We disagree.

■ ¶ 9 In Utah, state and local governments have the responsibility to regulate and provide warning to automobile traffic at railroad crossings. See Duncan v. Union Pac. R.R. Co., 790 P.2d 595, 599 (Utah Ct.App. 1990) aff'd, 842 P.2d 832 (Utah 1992); see also Utah Code Ann. §§ 54–4–15, 15.1 (1999); id. § 10–8–33. Duncan involved an accident in which a train struck an automobile at a crossing that the plaintiffs claimed was more than ordinarily hazardous. See Duncan, 790 P.2d at 597–98. For purposes of reviewing summary judgment for the defendant railroad, we assumed the crossing was more than ordinarily hazardous, see id., but held railroads have no duty to upgrade traffic warning devices even at such crossings. See id. at 599. We stated:

> Plaintiffs suggest that Union Pacific should have placed warning signs and devices on Droubay Road, including automatic gates

---

1. A cross buck is the familiar, white "X"-shaped sign with the words RAIL ROAD CROSSING in black letters.

blocking traffic on the Road from crossing the tracks when a train was approaching. It is not, however, the responsibility of the railroad to place signs and devices on the public road. The railroad must maintain its own right of way, but it is not under any duty to place signs or devices on the public road.

*Id.*

¶ 10 On certiorari, the Utah Supreme Court affirmed our decision and addressed whether the railroad had a duty to petition UDOT to upgrade the warning devices at the crossing at which the accident occurred—an issue not addressed in the court of appeals opinion. *See Duncan v. Union Pac. R.R. Co.*, 842 P.2d 832, 833 (Utah 1992). The supreme court held that railroads have no duty to urge or persuade UDOT to upgrade warning devices at crossings. *See id.* at 833–34. Although the supreme court did not state whether it assumed that the crossing in *Duncan* was more than ordinarily hazardous, as assumed by the court of appeals, the court's reasoning applies regardless of whether a crossing is more than ordinarily hazardous.

¶ 11 As the supreme court explained, state and federal legislatures have put in place a method for prioritizing crossing upgrades. *See id.* at 834. It was "[i]n view of this careful and orderly approach" that the court declined to impose a duty on railroads to interfere with that process. *Id.* It is no more appropriate for railroads to interfere in that process when a crossing is more than ordinarily hazardous.[2]

¶ 12 The Railroad Defendants had no duty either to install or to request that UDOT install additional or different warning devices at the crossing. Therefore, summary judgment for the Railroad Defendants was appropriate on this issue.

### B. Railroad Defendants' Duty to Decrease Train Speed

■ ¶ 13 Plaintiffs next argue the Railroad Defendants should have run their train at a slower speed through the crossing because the crossing constituted an "essentially local safety hazard." We conclude the trial court correctly held Plaintiffs' excessive speed tort claim was preempted, even assuming the crossing is a local safety hazard.

¶ 14 Pursuant to the National Railroad Safety Act (NRSA), 49 U.S.C. §§ 20101 *et seq.*, the United States Secretary of Transportation has promulgated regulations establishing speed limits on railroad tracks. *See* 49 C.F.R. § 213.9 (2000). The United States Supreme Court has noted that federal train speed regulations take into account alignment, curvature, and "hazards posed by track conditions." *CSX Trans., Inc. v. Easterwood*, 507 U.S. 658, 673–74, 113 S.Ct. 1732, 1742, 123 L.Ed.2d 387 (1993). Accordingly, federal train speed regulations "should be understood as covering the subject matter of train speed with respect to track conditions, *including the conditions posed by grade crossings.*" *Id.* at 675, 113 S.Ct. at 1743 (emphasis added). Because federal regulations cover the subject matter of train speed, state regulation of train speed is preempted. *See id.* at 675, 113 S.Ct. at 1743.

■ ¶ 15 The NRSA provides a limited exception to federal preemption of state law in the case of an "essentially local safety hazard." 49 U.S.C.A. § 20106(1) (2000). Specifically, "a State may ... continue in force an additional or more stringent law, regulation, or order relating to railroad safety when the law, regulation, or order: (1) is necessary to eliminate or reduce an essentially local safety hazard." *Id.* Although the NRSA allows states to regulate train speed legislatively or administratively to ameliorate the effect of a local safety hazard, the NRSA preempts state *tort* claims based on excessive train speed. *See Easterwood*, 507 U.S. at 675, 113 S.Ct. at 1732; *see also O'Bannon v. Union Pac. R.R. Co.*, 960 F.Supp. 1411, 1421 (W.D.Mo.1997) (holding excessive speed claim preempted because "[w]arning devices,

---

**2.** In any event, it is clear (as Plaintiffs argue) that UDOT recognized that upgrades were appropriate for this crossing and discussed an upgrade with South Jordan. The Railroad Defendants' alleged negligence in failing to petition UDOT to upgrade the warning devices therefore cannot have caused the accident because UDOT and South Jordan already knew of potential problems with the crossing.

grade, angle, and proximity to highways are all general conditions of crossings that are amenable to uniform, national standards"); *Herriman v. Conrail, Inc.*, 883 F.Supp. 303, 307 (N.D.Ind.1995) (holding speed claim preempted when background lights obscure train headlight at night); *Armstrong v. Atchison, Topeka & Santa Fe Ry. Co.*, 844 F.Supp. 1152, 1153 (W.D.Tex.1994) (holding speed claim preempted despite crossing with heavy vehicular traffic and no automatic gate with flashing lights). `

¶ 16 Plaintiffs argue there is an exception to this preemption for state tort claims where there is a "specific, individual hazard." *See Easterwood*, 507 U.S. at 675 n. 15, 113 S.Ct. 1732. This reference by the Supreme Court in *Easterwood* has been interpreted to refer to a transient condition that could lead to a particular accident. *See, e.g., Armstrong*, 844 F.Supp. at 1153 ("The 'specific, individual hazard' identified by the *Easterwood* court logically relates to the avoidance of a specific collision.").

¶ 17 Only two cases have held a tort claim for excessive speed not preempted. *See Stone v. CSX Transp., Inc.*, 37 F.Supp.2d 789, 794–98 (S.D.W.Va.1999); *Missouri Pac. R.R. Co. v. Lemon*, 861 S.W.2d 501, 510 (Tex.App.1993). In both, transient conditions, which arose after the speed limit for the track was established, either constituted a regulatory violation or imposed a regulatory duty on the railroad that the railroad neglected to perform.

¶ 18 *Lemon* involved a crossing at which the railroad had parked a line of tank cars in violation of the railroad's own safety rules and state regulations. *See* 861 S.W.2d at 509. The parked rail cars created a visual obstruction preventing the railroad engineer from seeing the crossing. *See id.* at 509–10. The court held that the illegally parked tank cars created a specific, individual hazard because "[t]he improper parking of tank cars which obstruct the view of a crossing is not a hazard which the Secretary took into consideration when determining train speed limits." *Id.* at 510.

¶ 19 *Stone* involved a malfunctioning automatic crossing gate of which the plaintiff alleged the railroad defendant was aware.

*See* 37 F.Supp.2d at 791–92. Federal regulations impose specific obligations upon a railroad receiving a report of a false activation, and the defendant in *Stone* did not undertake to fulfill those obligations. *See id.* (citing 49 C.F.R. § 234.107 (1999)). The court held that the plaintiff could proceed under a claim of negligence per se, as the alleged negligence was a violation of federal regulations. *See id.* at 795. The court also held that a separate claim of negligence was not preempted because the malfunctioning gate constituted a specific individual hazard. *See id.* at 795–96. The court was careful to point out that federal regulation of train speeds would not be displaced under the limited circumstances of that case. *See id.* at 796.

¶ 20 No similar circumstances in the present case render the 10200 South crossing a "specific, individual hazard." Rather, the conditions at the crossing at the time of the accident are as they were when the speed limit for the track was established and violated no statute or regulation.

¶ 21 Plaintiffs allege that, like the malfunctioning gates in *Stone*, the passive warnings in place at the time of the accident were defective. However, Plaintiffs have adduced no credible evidence of such defectiveness. On the contrary, undisputed evidence established that the first two cars in the caravan stopped and that all witnesses knew they were at a railroad crossing. Although different warning devices might have been more effective, the devices in place were not defective. Thus we conclude that the trial court correctly dismissed Plaintiffs' excessive speed claim against the Railroad Defendants.

## C. Amtrak's Duty to Brake

¶ 22 Next, Plaintiffs argue Amtrak breached a duty to brake the engine at the crossing because the crew knew or should have known that a collision was imminent as the train crew admitted they saw the three cars approach the crossing and worried that they might try to cross in front of the train. In effect, Plaintiffs argue that the three cars at the crossing constituted a specific local safety hazard. *See O'Bannon*, 960 F.Supp. at 1420–21 ("[A] 'specific individual hazard'

must be a discrete and truly local hazard, such as a child standing on the railway."); *Thompson v. CSX Transp., Inc.*, Civ. No. 1:97cv528GR (S.D.Miss. Sept. 14, 1999) ("A specific local safety hazard must be a condition so unusual that the Secretary could not have considered such in making a determination of train speed limits under the FRSA, as in the case in which an engineer sees a motorist stranded on the tracks, but fails to stop or slow to avoid the collision.").

¶ 23 Utah law speaks to a train operator's duty to apply an emergency brake:

> The motorman or engineer operating a train may assume, and act in reliance on the assumption, that a person on or approaching a crossing is in possession of his natural faculties and aware of the situation, including the fact that a train is a large and cumbersome instrumentality which is difficult to stop, and that the person will exercise ordinary care and take reasonable precautions for his own safety. If, consistent with his duty of due care, anything appears so that he either knows or should know that there is a likelihood of danger to a person near the tracks, it becomes his duty to use all reasonable efforts to give warnings, to slacken his speed, and if possible, to stop in time to avert an accident. The duty is measured by the exigencies of the occasion.

*Lawrence v. Bamberger R.R. Co.*, 3 Utah 2d 247, 252, 282 P.2d 335, 338 (1955) (footnotes omitted). Under *Lawrence*, a duty to brake arises only when the operator "knows or should know that there is a likelihood of danger to a person near the tracks." *Id.* As the Washington Supreme Court has stated:

> [O]ne operating a locomotive and train has a right to assume, until the contrary becomes evident, that one approaching the track in an automobile will give the train the right of way, and is not required to attempt to bring his train to a standstill because the automobile may be seen to be approaching the track, but has a right to assume, until the contrary appears, that the occupants of such automobile will use reasonable care for their protection, and

will give the train the right of way to which it is entitled under the law.

*Klouse v. Northern Pac. Ry. Co.*, 50 Wash.2d 432, 312 P.2d 647, 651 (1957) (quoted by *Power v. Union Pac. R.R. Co.*, 655 F.2d 1380, 1384 (9th Cir.1981)).

¶ 24 We conclude under the undisputed facts in the present case that the train operator was justified in assuming the decedents' car would remain stopped at the crossing and that the duty to brake did not arise until the decedents' car drove onto the railroad tracks. A contrary ruling would impose a tort duty on train operators to brake a train any time the first in a line of cars at a crossing attempts to cross in front of the train. This is precisely the dangerous maneuver that *Lawrence* and *Power* seek to avoid.

¶ 25 Thus we conclude that a "specific local safety hazard" did not give rise to a duty to brake until decedents' car drove onto the track. Therefore, the trial court was correct to conclude that as a matter of law Plaintiffs cannot show that Amtrak's failure to brake caused the accident. The train was traveling at nearly 70 miles per hour just before the accident and the operator had only a few seconds to apply the brake before impact. Plaintiffs offer no evidence that the train could have slowed enough in a few seconds to avoid the accident. Plaintiffs thus have not preserved a genuine issue of material fact on causation, and Defendants are entitled to summary judgment on this issue.

### D. Amtrak's Duty to Give Adequate Audible Warning

¶ 26 Plaintiffs argue Amtrak was not entitled to summary judgment on the issue of whether Amtrak provided an adequate audible warning as it approached the crossing.

¶ 27 Plaintiffs first argue that a question of fact remains as to whether Amtrak sounded its horn in a timely manner. Plaintiffs rely on testimony from witnesses in the first and third vehicles who testified that they either heard no train horn at all or heard the train horn only as the train occupied the 10600 South crossing and then again just before the collision. Plaintiffs do not dispute that the witnesses were in automo-

biles with the windows closed and music playing.

¶ 28 The train crew testified that they sounded the standard warning signal using the train's automatic sequencer.[3] The Railroad Defendants additionally rely on data from an event recorder on the train that records such information as train speed, application of brakes, and horn activation. Data from the event recorder demonstrate unequivocally that the horn was activated in automatic mode for about forty seconds preceding the collision.

¶ 29 The Amtrak employee in California who downloaded the data from the recorder testified: "The recorded data reveals, as evidenced on this graph, that prior to application of the emergency brake, the train was traveling 68 mph and the horn was in the on position." Another Amtrak employee, Mark Sadler, testified in deposition, "my review of the speed tape indicated that it was a continuous thing from the previous crossing all the way through to this crossing here where it took place." Mike Brand, a road foreman for Southern Pacific at the time of the accident, testified that the data "shows the train's horn had been sounding (meaning it was in the on position) for approximately 40 seconds before application of the emergency brakes and it continued to sound thereafter until the train came to a complete stop." The Railroad Defendants argue Plaintiffs' negative evidence—i.e., that witnesses did not hear the train horn until just before the collision—cannot avoid summary judgment in light of the data from the train's event recorder.

¶ 30 Our supreme court has recognized that, although the credibility of negative evidence is generally a question for the jury, "in certain circumstances negative testimony will be insufficient to support a jury verdict." *Curtis v. Harmon Elec., Inc.,* 575 P.2d 1044, 1047 (Utah 1978). This case presents such a circumstance.

¶ 31 The event recorder from the locomotive provides objective evidence that the horn in fact sounded the standard crossing warning sequence for more than half a minute prior to the accident. Accordingly, we think the negative evidence presented by Plaintiffs does not preserve a genuine issue of material fact, and summary judgment for Defendants on this issue was appropriate.

■ ¶ 32 Plaintiffs next argue that Amtrak should have sounded an emergency horn pattern as the train approached the crossing because the train crew should have known that the vehicles were unaware of the approaching train and thus would pull out in front of the train.[4]

¶ 33 As we have explained, the collision in this case did not become imminent until the decedents' car pulled onto the tracks. Thus, even assuming that the train crew must sound an emergency sequence when a collision becomes imminent *at a crossing*, the train crew had only a few short seconds to switch the horn from the automatic crossing sequence to the emergency sequence. Accordingly, we conclude Plaintiffs cannot show the sequence in which the horn was sounded caused the collision. Furthermore, there is no evidence in the record to establish that the sounding of the emergency horn pattern earlier would have stopped the decedents from pulling onto the track in front of the train. Summary judgment for Amtrak was therefore appropriate.

## II.   Claims Against South Jordan

¶ 34 Plaintiffs argue South Jordan breached its duty to provide adequate active warning devices at the crossing and its duty to properly install and maintain the passive warning devices. South Jordan argues that it is immune from suit and, if not immune, that it breached no duty to Plaintiffs.

---

3.  The automatic sequencer is engaged manually and repeats the long-long-short-long crossing warning sequence until it is turned off manually.

4.  The General Code of Operating Rules, under which Amtrak operates, prescribes a "long-long-short-long" series when a train approaches a grade crossing and a "succession of short sounds" "when an emergency exists, or persons or livestock are on the track ."

## A. Failure to Install Adequate Crossing Warning Devices—Sovereign Immunity

¶ 35 South Jordan argued below and now on appeal that sovereign immunity bars Plaintiffs' claim that South Jordan failed to provide adequate warning devices at the crossing.

¶ 36 "Except as may be otherwise provided ..., all governmental entities are immune from suit for any injury which results from the exercise of a governmental function[.]" Utah Code Ann. § 63–30–3(1) (1997). Although immunity is statutorily waived for injuries caused by dangerous or defective roadways, *see id.* § 63–30–8, immunity is retained if the injuries arise from "the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused." *Id.* § 63–30–10(1); *see also Trujillo v. Utah Dept. of Transp.,* 1999 UT App 227, ¶¶ 13–17, 986 P.2d 752.

¶ 37 The issue in this case is whether, even if South Jordan failed to install adequate crossing warning devices, it is immune from suit because it was performing "a discretionary function."

¶ 38 Discretionary functions must satisfy four criteria:

(1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective?

(2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective?

(3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved?

(4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Trujillo,* 986 P.2d 752, 1999 UT App 227 at ¶ 27. Plaintiffs concede the first two criteria but dispute the second two.

¶ 39 We are persuaded that South Jordan exercised basic policy evaluation, judgment, and expertise in attempting to provide convenient access while seeking to remedy the safety difficulties inherent from railroad tracks running through the city. Documentary evidence shows that South Jordan debated a number of alternatives for improving traffic safety while considering budgetary and other practical constraints. The documents on which Plaintiffs rely to prove South Jordan's negligence reveal that the city was undertaking review of its options for improving public safety in relation to the railroad tracks traversing the city. Those options included, among others, constructing an underpass at 10600 South, rerouting the frontage road along the west side of the tracks, and combining the 10200 South crossing with another crossing. Deciding among these options required South Jordan to select alignments for public highways and prioritize public budgets while providing access to properties and industrial areas that had access over the tracks at the crossings slated to be closed. *See Keegan v. State,* 896 P.2d 618, 619–20, 624 (Utah 1995) (holding third requirement filled where agency decision "involved a determination of not only the degree of safety that would be provided by various options considered, but also what degree of safety would be an appropriate goal given time and cost constraints"). Although hindsight may reveal that South Jordan used poor judgment in not closing the crossing when the city recognized the crossing was dangerous and UDOT repeatedly asked it to install active restraints or close the crossing, our review is limited to whether basic policy evaluation, judgment, and expertise were exercised, not whether they were exercised well. *See* Utah Code Ann. § 63–30–10(1) (1997).

¶ 40 We are likewise persuaded that South Jordan acted under statutory authority. The city council has statutory authority to control the city's finances. *See* Utah Code Ann. § 10–8–1 (1999). Further, municipalities "may provide for or change the location, grade or crossing of any railroad." *Id.* § 10–8–34. Thus, in debating the appropriate course of action in expending the city's bud-

get to improve public safety, South Jordan acted within its statutory authority. In essence, South Jordan's "decision involved just the sort of policy-driven weighing of costs and benefits that the discretionary function exception was meant to protect." *Keegan*, 896 P.2d at 624.

¶ 41 Plaintiffs argue that South Jordan exercised no discretion because UDOT exercises sole statutory authority to determine the type of warning device required at a crossing. UDOT is authorized to "provide for the installing, maintaining, reconstructing, and improving of automatic and other safety appliances, signals or devices at grade crossings," Utah Code Ann. § 54–4–15.1 (1994), and may prescribe a municipality's share of the cost of improving safety devices at crossings. *See id.* § 54–4–15.3. Even assuming that UDOT had the authority to order South Jordan to upgrade the devices at the crossing, there is no evidence of such an order or the allotment of funds to pay for such action.

¶ 42 We therefore need not determine whether South Jordan would be exercising its discretion if UDOT had ordered one or another course of action. Here, UDOT ordered no course of action, and South Jordan was exercising its discretion in debating how best to proceed with restructuring its road system around the safety issue at the crossing.[5]

### B. Failure to Maintain Passive Safety Devices

¶ 43 Plaintiffs further claim that South Jordan breached its duty to properly maintain the passive safety devices at the crossing. Plaintiffs allege that the safety devices were improperly placed and improperly reflectorized. Although a municipality generally has no duty to erect a particular traffic safety device, "the common law requires ... that once the municipality takes action to install such devices, it must do so in a non-

negligent manner." *Jones v. Bountiful City Corp.*, 834 P.2d 556, 560 (Utah Ct.App.1992).

¶ 44 Even assuming that the signs were improperly placed or reflectorized, Plaintiffs offer no credible evidence that either condition caused the accident. Each witness at the accident stated that they knew they were approaching a railroad crossing. Both the first and second car came to a stop where the stop sign and crossbucks marked the railroad crossing. Thus, Plaintiffs offer no evidence that the signs did an inadequate job of warning motorists to stop because they were at a railroad crossing. Plaintiffs thus preserve no genuine issue of material fact as to whether South Jordan's allegedly negligent installation or maintenance of the passive warning devices caused the accident. Summary judgment for South Jordan on this issue was therefore appropriate.

¶ 45 Accordingly, we conclude summary judgment for South Jordan on all claims against it was appropriate.

### CONCLUSION

¶ 46 We conclude that the Railroad Defendants had no duty to upgrade the warning devices; that the Plaintiffs' excessive speed tort claim is preempted by federal law; that Amtrak did not have a duty to brake; that there is no genuine issue of material fact as to whether Amtrak sounded its horn in a timely manner; and that Plaintiffs have not shown, and there is no evidence in the record to suggest that sounding the emergency horn pattern would have prevented the accident.

¶ 47 As to defendant South Jordan, we conclude that the city exercised basic policy, evaluation, judgment, and expertise and acted under statutory authority. We also conclude that there is no genuine issue of material fact as to whether the city breached its duty to properly maintain the safety devices at the crossing.

¶ 48 Accordingly, we affirm.

¶ 49 I CONCUR: WILLIAM A. THORNE, JR., J.

---

5. Even if we were to hold that South Jordan was not performing a discretionary act, we would conclude that it breached no duty in not installing active warning devices. Generally, a municipality has no duty to erect a particular traffic control device. *See Jones v. Bountiful City Corp.*, 834 P.2d 556, 560 (citing 19 Eugene McQuillin, *The Law of Municipal Corporations* § 54.28b, at 90 (3d ed.1985)). Nothing in Utah's statutory scheme alters this common law rule in the present case.

ORME, Judge (concurring in part, concurring in the result in part, and dissenting in part):

¶ 50 I concur in parts IA, IB, and ID of the main opinion, and I concur in the result reached in part IC, although I do not agree with all of the analysis in that section. I also concur in part IIB. With respect to part IIA, I respectfully dissent.

¶ 51 I am not prepared to hold, as a matter of law, that the municipality's failure to do anything to improve the safety at the crossing was the product of a careful policy judgment made in the course of discretionary decision-making. On the contrary, there are indications in the record that over the course of many years, UDOT called the unsafe condition of the crossing to South Jordan's attention, repeatedly beseeched it to do something, and offered to help plan and fund the improvements. Rather than responding with thoughtful analysis of why such improvements would not, on balance, be in the city's best interest, there are indications the city simply dropped the ball, essentially ignoring UDOT's expressed concerns and doing nothing. This does not appear to be a situation where the city actually came to grips with the problem and made a rational decision to leave the crossing as it was for reasons deemed sound by the municipality after a thoughtful inquiry.[1]

¶ 52 I do not mean to suggest that, as a matter of law, the city did not have the protection offered by the discretionary function variant of the sovereign immunity doctrine. I mean only to say that the record in this regard is such that summary resolution of the question was not proper. I would reverse the summary judgment with respect to this claim against the municipality and permit a factfinder to evaluate the competing evidence.

---

1. Indeed, there is evidence that on one or more occasions over the last twenty years, the city even acknowledged the wisdom of installing gates and flashing lights at the crossing and was aware that federal funds would cover essentially all of the resulting expense.