2002-NMCA-021

41 P.3d 347

Wilbert LARGO, Plaintiff–Appellant,

v.

The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, a Delaware corporation, and J.P. Bigley, Defendants–Appellees.

No. 21,927.

Court of Appeals of New Mexico.

Dec. 10, 2001.

Scott E. Borg, Rosenfelt, Barlow & Borg, P.A., Albuquerque, NM, Robert A. Schuetze, Cortez Macaulay Bernhardt & Schuetze LLC, Denver, CO, for Appellant.

Tim L. Fields, Earl E. Debrine, Jr., Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, NM, for Appellees.

## OPINION

FRY, Judge.

{1} This case concerns a fatal collision between a train and a pickup truck driven by Hudson Benally at a railroad crossing near Coolidge, New Mexico. Benally was killed, and his passenger, Plaintiff Wilbert Largo, was injured. Virginia Tom, Benally's personal representative, and Largo filed suit against the Atchison, Topeka and Santa Fe Railway Company (Railroad) and the engineer, alleging negligence. Tom and Defendants have settled, and Largo remains as Plaintiff.

{2} At issue in this interlocutory appeal is the trial court's order granting Defendants summary judgment on Plaintiff's claims that warnings at the crossing were inadequate and that excessive speed of the train contributed to the accident. The court held that Plaintiff's state law negligence claims were preempted by the Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20101 (1994).[1] We affirm in part and reverse in part. We hold that Plaintiff's excessive speed claim is preempted by federal law, but Plaintiff's claim that warnings were inadequate is not preempted. We reject Defendants' alternative argument, not ruled on below, that the Railroad had no duty to maintain adequate warnings.

## BACKGROUND

{3} On December 23, 1994, at approximately 6:30 p.m., Benally and Largo were returning from a shopping trip. They were driving north on County Road 27, a gravel road in McKinley County, in a pickup truck Benally had borrowed from his brother. There is some evidence that Benally had not driven on the road before that evening. Conditions were dark, clear, and dry.

{4} As Benally approached the crossing, a westbound train was also approaching the crossing at approximately 70 miles per hour, which is below the legal limit set by federal law. J.P. Bigley, the engineer, said that as he approached the crossing he sounded the horn in the normal pattern. The conductor, Lesley Sharp, in the train with Bigley, said they saw the vehicle approaching the crossing and the engineer was blowing the horn. Sharp said, "It looked like the car was slowing and possibly going to stop, and just before we got to the crossing, the car took a surge and just jumped out in front of the train." The evidence suggested that the Benally vehicle was struck at the near rail, just as it proceeded into the train's path.

## DISCUSSION

█ {5} Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Rule 1–056(C) NMRA 2001; *Self v. United Parcel Serv., Inc.*, 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970

---

1. The FRSA was previously codified at 45 U.S.C. § 421–447 (1988). *See Stone v. CSX Transp., Inc.*, 37 F.Supp.2d 789, 793 n. 1 (S.D.W.Va. 1999).

P.2d 582. Whether Defendants were entitled to judgment as a matter of law based on federal preemption is a legal question we review de novo. *Self,* 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582,.

 {6} The doctrine of preemption is based on the Supremacy Clause of Article VI of the United States Constitution. *Id.* ¶ 7. The purpose of the preemption doctrine is to allow Congress to promulgate a uniform federal policy without states frustrating it through either legislation or judicial interpretation. *Id.* Federal regulations may preempt common law as well as statutory duties. *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). However, there is "a strong presumption against preemption." *Montoya v. Mentor Corp.,* 1996–NMCA–067, ¶ 7, 122 N.M. 2, 919 P.2d 410. Additionally, "[t]here is … a reluctance to preempt state laws relating to health and safety matters because those matters have been the exclusive concern of the states." *Id.*

{7} The relevant statute is the FRSA, which directs the Secretary of Transportation to "maintain a coordinated effort to develop and carry out solutions to the railroad grade crossing problem." 49 U.S.C. § 20134(a). The FRSA also contains a preemption provision stating that "[l]aws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106.

 {8} The party seeking to establish preemption must establish that federal regulations cover "the same subject matter as [state] negligence law pertaining to the maintenance of, and the operation of trains at, grade crossings." *Easterwood,* 507 U.S. at 664, 113 S.Ct. 1732; *see also Norfolk S. Ry. Co. v. Shanklin,* 529 U.S. 344, 352, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000). It is not sufficient that the federal regulations " 'touch upon' or 'relate to' that subject matter." *Shanklin,* 529 U.S. at 352 (quoting *Easterwood,* 507 U.S. at 664, 113 S.Ct. 1732). Federal regulations "cover" the same subject matter "only if the federal regulations substantially subsume the subject matter of the relevant state law." *Easterwood,* 507 U.S. at 664, 113 S.Ct. 1732; *Shanklin,* 529 U.S. at 352, 120 S.Ct. 1467.

## I. Inadequate Warning

 {9} Defendants argue that federal law preempts Plaintiff's claim that the warning devices at the crossing were inadequate. In *Shanklin,* the Supreme Court held that the FRSA "pre-empts state tort claims concerning a railroad's failure to maintain adequate warning devices at crossings where federal funds have participated in the installation of the devices." 529 U.S. at 351, 120 S.Ct. 1467. Because Federal Highway Administration (FHWA) regulations " 'establish requirements as to the installation of particular warning devices,' " when these regulations are applicable, " 'state tort law is preempted.' " *Shanklin,* 529 U.S. at 352, 120 S.Ct. 1467 (quoting *Easterwood,* 507 U.S. at 670, 113 S.Ct. 1732). However, *Easterwood* and *Shanklin,* when read together, make it clear that federal law preempts state law only when federal funds are actually spent on warning devices. In *Easterwood,* the Court held that FHWA regulations did not preempt state tort law because the warning devices contemplated by the crossing project were never actually installed, and therefore, there was no evidence "that federal funds participate[d] in the installation of the [warning] devices" at the crossing—a prerequisite to preemption. *Easterwood,* 507 U.S. at 671–72, 113 S.Ct. 1732 (citation and internal quotation marks omitted). By contrast, but in a holding consistent with *Easterwood,* the Court in *Shanklin* held that preemption applied because federal funds paid for the warning devices installed as part of the crossing improvement project. *Shanklin,* 529 U.S. at 354, 120 S.Ct. 1467. Under both *Easterwood* and *Shanklin,* "the determinative question in a particular case is … whether federal funds have participated in the installation of warning devices." *Armijo v. Atchison, Topeka & Santa Fe Ry. Co.,* 19 F.3d 547, 550 (10th Cir.1994).

{10} In the case at bar, the record does not establish that any federal money was spent installing warning devices at the crossing. In 1978, a federal program provided $2,056 to widen and install sixteen track feet

of timber planking at the crossing. However, the record indicates that no warnings were placed at the crossing as the result of the federal program. The minimal level of federal involvement at this crossing does not cover or substantially subsume "the same subject matter as [state] negligence law pertaining to the maintenance of, and the operations of trains at, grade crossings." *Easterwood*, 507 U.S. at 664, 113 S.Ct. 1732; *see also, Shanklin*, 529 U.S. at 352, 120 S.Ct. 1467.

■ {11} Defendants argue that under *Shanklin*, 529 U.S. at 354, 120 S.Ct. 1467, a state tort action is pre-empted when federal funds participate at any level in the crossing improvement project. They contend that this is so because as a prerequisite to undertaking the improvement project the FHWA necessarily must have determined that the warnings were adequate. We disagree. The *Shanklin* Court made it clear that FHWA's determination of, or its failure to determine, the adequacy of warning devices is irrelevant to the preemption inquiry. *Id.* at 357–58, 120 S.Ct. 1467. Instead, the relevant consideration is whether FHWA's regulations "establish a federal standard for the adequacy of those devices that displaces state tort law addressing the same subject." *Id.* at 357, 120 S.Ct. 1467.

{12} We hold that because federal funds were not actually used to install warning devices at the crossing, preemption does not bar Plaintiff's state law claim that warnings were inadequate. We reverse summary judgment for Defendants on this claim and remand it for trial.

## II. The Railroad's Duty to Ensure Safe Crossings

■ {13} As an alternative to their preemption argument, Defendants contend that they have no duty to install and maintain adequate warning devices at railroad crossings because state statutes give the state highway department and applicable local governmental entities the exclusive authority to place warning devices. *See* NMSA 1978, §§ 66–7–102, –103, –108, –109, and –342 (1978). Plaintiff counters that the district court did not rule on this issue and therefore

we should not consider it. It is true that the district court did not rule on this issue; however, Defendants raised it below and we therefore consider it as a possible ground for affirmance. *See State v. Torres*, 1999–NMSC–010, ¶ 22, 127 N.M. 20, 976 P.2d 20 (holding that the trial court will be affirmed if right for any reason, unless it would be unfair to the other party).

■ {14} The interpretation of statutes is a question of law, *Bajart v. Univ. of N.M.*, 1999–NMCA–064, ¶ 7, 127 N.M. 311, 980 P.2d 94, and our goal in interpreting statutes is to determine legislative intent. *State v. Shop Rite Foods, Inc.*, 74 N.M. 55, 57, 390 P.2d 437, 438 (1964). Defendants' argument relies on Section 66–7–108, which states:

A. No person shall place, maintain or display upon or in view of any highway any unauthorized sign, signal, marking or device which purports to be or is an imitation of or resembles an official traffic-control device or railroad sign or signal, or which attempts to direct the movements of traffic, or which hides from view or interferes with the effectiveness of any official traffic-control device or any railroad sign or signal, and no person shall place or maintain nor shall any public authority permit upon any highway any traffic sign or signal bearing thereon any commercial advertising.

We do not agree with Defendants that Section 66–7–108 prohibits the Railroad from insuring that there are adequate warnings at railroad crossings, or that the legislature intended to absolve railroads of all responsibility for warnings at railroad crossings. Instead, this statute has the obvious purpose of prohibiting false or unofficial traffic signs. While this and other statutes cited by Defendants may place primary responsibility with governmental entities, they do not prohibit railroads from addressing dangerous crossings.

{15} In addition, railroads have a common-law duty to provide and adequately maintain warnings at railroad crossings. "While final authority for the installation of particular safety devices at grade crossings has long rested with state and local governments, this

allocation of authority apparently does not relieve the railroads of their duty to take all reasonable precautions to maintain grade crossing safety...." *Easterwood*, 507 U.S. at 665 n. 5, 113 S.Ct. 1732 (citation omitted). Had the legislature intended to abrogate the railroad's common law duty to provide safe crossings, we would expect to see the legislature's intent clearly expressed. *See Gallegos v. Lyng*, 891 F.2d 788, 798 (10th Cir.1989) (instructing that implied repeals of common law are disfavored and should be found only where such a statutory purpose is evident). The statutes relied on by Defendants simply do not demonstrate that the legislature intended to absolve railroads of their common law duty to provide adequate warnings at crossings. *Cf. Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 236 (Mo.2001) (en banc) (rejecting railroad's argument that it had no duty to ensure adequate warning devices because state agency had the responsibility to do so); *but see Duncan v. Union Pac. R.R. Co.*, 842 P.2d 832, 833 (Ut.1992) (finding that railroad had no duty to ensure adequate warnings at crossings or to notify state authorities of the need to upgrade warnings).

{16} Finally, in addition to the statutory and common law support for our holding, public policy considerations convince us that railroads have a duty to provide adequate warnings at dangerous crossings. *See Pollock v. State Highway & Transp. Dep't*, 1999–NMCA–083, ¶ 10, 127 N.M. 521, 984 P.2d 768 (construing a statute so as to impose a duty on the Highway Department because "public policy supports accountability and review of the Department through imposition of a duty"). Railroad employees are in the best position to evaluate difficulties at crossings and to identify crossings that have presented problems because they use the crossings every day. *See Easterwood*, 507 U.S. at 668, 113 S.Ct. 1732 (recognizing that railroads are "the entities arguably most familiar with crossing conditions"). Railroads also have superior knowledge about accidents at particular crossings, because they must deal with insurance claims and lawsuits arising out of those accidents. Public policy and common sense dictate that when railroads become aware of particular hazards and dangerous conditions, they should at a minimum be required to notify the appropriate governmental authorities that improvements are necessary. *See Easterwood*, 507 U.S. at 665 n. 5, 113 S.Ct. 1732 (noting that under Georgia law, even though the final authority for the installation of particular safety devices at a crossing rests with state and local governments, the railroads are not relieved of their duty to take "all reasonable precautions to maintain grade crossing safety, including, for example, identifying and bringing to the attention of the relevant authorities dangers posed by particular crossings." (citation omitted)). We reject Defendants' argument that railroads have no duty whatsoever to do anything about hazardous crossings.

## III. Excessive Speed

{17} The district court granted summary judgment against Plaintiff on his excessive speed claim, ruling that it was preempted by federal law. We agree. Excessive speed claims are preempted because federal speed limits cover "the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings." *Easterwood*, 507 U.S. at 675, 113 S.Ct. 1732.

{18} Under federal law, the crossing in this case has a maximum speed of 110 miles per hour for passenger trains and 80 miles per hour for freight trains. The timetable set by the Railroad allowed passenger trains to travel at 90 miles per hour, and freight trains at 70 miles per hour. However, the Railroad had the discretion to restrict speed for certain sections of track or crossings by issuing a "slow order," an order requiring a slower speed. Plaintiff argues that the characterization of the crossing in question compelled the Railroad to issue a slow order because the crossing constituted an "essentially local safety hazard" or a "specific, individual hazard."

### A. Essentially Local Safety Hazard

{19} Plaintiff argues that this case falls within the savings clause of 49 U.S.C. § 20106:

A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation or order—(1) is necessary to eliminate or reduce an essentially local safety hazard; (2) is not incompatible with a law, regulation, or order of the United States Government; and (3) does not unreasonably burden interstate commerce.

Thus, Plaintiff claims state negligence law would require Defendant Railroad to set a slower speed for this section of track because the crossing constituted a "an essentially local safety hazard." *Id.*

{20} Plaintiff introduced evidence in support of his argument. The crossing in this case is less than a mile north of Interstate 40. The approach from the south involves a curve, an acute angle, and a hump profile at the crossing itself, all of which make it more difficult for a driver to see a train approaching from the east. Because of the acute angle of the approach, a driver might not see an approaching westbound train while looking straight ahead through his windshield, but would only see it by looking through a rear window. There had been three prior train-vehicle collisions similar to this one at the crossing, in which vehicles heading north were struck by westbound trains. At the time of the accident, there were no warning lights or gates at the crossing. The crossing was marked only with crossbuck signs-reflective black-and-white signs indicating an "X" and stating, "RAILROAD CROSSING." There was also a small yellow reflective warning sign 100 feet south of the crossing. There were two train-vehicle collisions at the crossing, including this one, in a nine-month period, out of less than twenty-five per year in all of New Mexico. The McKinley County sheriff's office responded to citizens' concerns about the dangerousness of the crossing and noted that, because of the angle of approach, drivers would not see a train until they were 0.1 mile from the crossing. Most or all of the other highly traveled McKinley County road crossings had mechanical warning devices. Several years after this accident, gates and flashing lights were installed.

{21} Despite Plaintiff's comprehensive argument regarding the danger of this railroad crossing, the law does not support a waiver of the federal speed preemption for three reasons. First, Section 20106 requires Plaintiff to establish all three elements of the savings clause, including the third element requiring that the state law in question "does not unreasonably burden interstate commerce." 49 U.S.C. § 20106(3). Plaintiff does not direct our attention to any evidence regarding this element.

{22} Second, the *Easterwood* Court rejected this argument, stating that "the [federally established] speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation." *Easterwood,* 507 U.S. at 674, 113 S.Ct. 1732. Moreover, "the Secretary's regulations focus on providing appropriate warnings given variations in train speed." *Id.* Thus, the regulatory scheme as a whole addresses state concerns about crossing safety in a variety of ways, which together "substantially subsume the subject matter of the relevant state law." *Id.* at 664, 113 S.Ct. 1732.

{23} Third, the Federal Railroad Administration of the Department of Transportation (FRA) has made it clear that there are sound reasons for federal preemption:

FRA's current regulations governing train speed do not afford any adjustment of train speeds in urban settings or at grade crossings. This omission is intentional. FRA believes that locally established speed limits may result in hundreds of individual speed restrictions along a train's route, increasing safety hazards and causing train delays. The safest train maintains a steady speed. Every time a train must slow down and then speed up, safety hazards, such as buff and draft forces, are introduced. These kinds of forces can enhance the chance of derailment with its attendant risk of injury to employees, the traveling public, and surrounding communities.

63 Fed.Reg. No. 119, 33993, 33999 (June 22, 1998). It is apparent that, at least with respect to train speed, Congress intended to promulgate a uniform federal scheme that cannot be frustrated by the various states.

It is this intent that requires adherence to preemption doctrine. *See Self,* 1998–NMSC–046, ¶ 7, 126 N.M. 396, 970 P.2d 582.

{24} We recognize that since *Easterwood,* courts have achieved divergent results when they consider the question of what constitutes an "essentially local safety hazard." Some courts have construed the phrase narrowly, declining to apply it to crossings that have problems like the ones presented by the crossing in this case. *See, e.g., O'Bannon v. Union Pac. R.R. Co.,* 960 F.Supp. 1411, 1421 (W.D.Mo.1997) (determining that the absence of active warning devices, steep grade and angle of crossing, and the proximity of the crossing to a highway did not constitute a local safety hazard); *Gunn v. Atchison, Topeka & Santa Fe Ry. Co.,* 13 S.W.3d 52, 55 (Tex.App.1999) (holding that an angle of crossing requiring a driver to look backward rather than merely to the right did not constitute a local hazard). These cases rely on the rationale that increasing train speed restrictions along a train's route undermines a uniform policy, imposes delays, and increases the chances of a derailment.

{25} Other courts have found an "essentially local safety hazard" based on the peculiarities of a crossing. *See In re Speed Limit for Union Pac. R.R. Through City of Shakopee,* 610 N.W.2d 677, 684 (Minn.Ct.App.2000); *Stone v. CSX Transp., Inc.,* 37 F.Supp.2d 789, 794–97 (S.D.W.Va.1999); *Mo. Pac. R.R. Co. v. Lemon,* 861 S.W.2d 501, 509–10 (Tex. App.1993). These cases are distinguishable from the case at bar.

{26} In *City of Shakopee,* the city imposed a ten-mile-per-hour limit on trains using a one-mile section of track through the city's central business district. The track ran right down the middle of the street, and had vehicular traffic on both sides. Two to four thousand vehicles a day used the roadway. There were ten crossings in the one-mile section, and none had gates; all were marked with signs. Pedestrians used the area as well. The court held that the ten-mile-per-hour limit was allowable because the section constituted an essentially local safety hazard. The facts in *City of Shakopee* are unique, and the result there is understandable. We do not agree that the facts in this case approach those in *City of Shakopee.*

{27} *Stone* is also distinguishable. It involved a signal that falsely activated so often that everyone ignored it. The court stated that taking into account "terrain, the sight lines, and the limited access into consideration, and assuming that there were repeated malfunctions of the signal apparatus at that crossing, the Court would likely conclude that the Ventroux Hollow grade crossing was a local hazard." *Stone,* 37 F.Supp.2d at 796. However, the court relied heavily on the fact that federal regulations required the railroad to issue a slow order when it was aware of problems with a signal falsely activating. Consequently, the court held that Plaintiff's claim was not preempted because its holding would not result in state law displacing federal law, and would not allow the local hazard exception to swallow the general rule. *Id.*

{28} *Lemon* held that a crossing that was obstructed because the railroad had illegally parked train cars so as to obstruct the engineer's vision, combined with the fact that the crossing was unlit, unmarked by active warning devices, and that the road curved approaching the tracks, was a specific, individual hazard. *Lemon,* 861 S.W.2d at 509–10. *Lemon* is distinguishable because it involves affirmative, illegal conduct that made the crossing more dangerous.

{29} This case does not present the unique circumstances of the cases that found "an essentially local safety hazard." Although the evidence here suggested that there were physical characteristics of the crossing making it difficult for drivers to see a westbound train, there are signs marking the railroad crossing and there is countervailing evidence that drivers could see a train when they were 0.1 mile from the crossing.

{30} Given the clear direction of Congress and the FRA, it is apparent that Plaintiff bears a heavy burden in seeking to establish an essentially local safety hazard. This ensures that the policies advanced by preemption remain in force. Otherwise, the exception will swallow the rule. Railroads will be forced to cobble together a patchwork of train speeds, reacting to every crossing that involves some peculiarity or has some acci-

dent history. *See Easterwood,* 507 U.S. at 675, 113 S.Ct. 1732 (emphasizing the need for uniformity and for the Secretary to be able to set speed limits without having to make countless adjustments for local conditions). Our holding advances the goal of uniformity expressed in *Easterwood.*

### B. Specific, Individual Hazard

{31} Plaintiff argues for the first time in a pleading entitled "Appellant's Submission of Additional Legal Authority," filed after his reply brief, that his excessive speed claim is not preempted because the approach of the Benally vehicle constituted a "specific, individual hazard." It is inappropriate to raise a new argument in this fashion. *Cf. Villanueva v. Sunday Sch. Bd.,* 121 N.M. 98, 105, 908 P.2d 791, 798 (Ct.App.1995) ("[R]aising new issues in the reply brief, when it is too late for an appellee to respond to them, is insufficient to obtain a review of those issues.").

{32} Even if we were to consider Plaintiff's new theory, not advanced in his brief in chief or reply brief, we would reject it. Although *Easterwood* states that "the duty to slow or stop a train to avoid a specific, individual hazard" would not be preempted, 507 U.S. at 675–76 n. 15, 113 S.Ct. 1732, there is no evidence of such a hazard in the present case. A "specific, individual hazard" applies to a situation where a person or car is already on the tracks and the engineer must slacken speed and try to stop. *See O'Bannon,* 960 F.Supp. at 1420–21 (discussing cases finding a "specific, individual hazard" where, for example, a train failed to reduce speed to avoid striking a child on the railway). There is no evidence in this case that the Benally vehicle was already on the tracks. Rather, the evidence establishes that the truck was moving toward the tracks and the engineer did not know whether it would stop. An engineer does not have to slacken speed or throw the train into emergency stop every time he wonders whether an approaching vehicle will stop. *Price v. Nat'l R.R. Passenger Corp.,* 14 P.3d 702, 708 (Utah Ct.App.2000), (holding that an engineer has the right to assume that the driver of an approaching automobile will give the train the right of way, and is not required to bring his train to a standstill simply because the automobile is approaching the track, unless it becomes evident the automobile is proceeding onto the tracks).

### IV. Motion to Strike

{33} Defendants attached two exhibits to their answer brief. Plaintiff moved to strike these exhibits arguing that they reflect matters not of record. We agree. Neither exhibit was before the trial court until after the motion for summary judgment was granted and the case was accepted by this Court as an interlocutory appeal. Matters not of record are not considered on appeal. *Gallegos v. City of Albuquerque,* 115 N.M. 461, 466, 853 P.2d 163, 168 (Ct.App.1993) (holding that appellate review of order appealed from cannot be based on evidence that had not been presented to the judge at the time the order was entered). Defendants have offered no compelling reason why we should depart from our longstanding rule that matters not of record are not considered on appeal, and we grant the motion to strike the exhibits attached to Defendants' brief.

{34} Plaintiff also moved to strike Defendants' argument that they had no duty to ensure that warnings at the crossing were adequate. We deny this part of the motion. Defendants are correct that their argument would provide an alternative basis for affirmance. *Torres,* 1999–NMSC–010, ¶ 22, 127 N.M. 20, 976 P.2d 20 (holding that the trial court will be affirmed if right for any reason). However, we have addressed Defendants' duty argument and rejected it.

### CONCLUSION

{35} We reverse the grant of summary judgment on the inadequate warning claim and remand that claim for trial. We affirm the district court's grant of summary judgment on the excessive speed claim.

{36} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID, and JAMES J. WECHSLER, Judges.